925 A.2d 1

ABRAHAM HEMSEY, PETITIONER–APPELLANT, v. BOARD
OF TRUSTEES, POLICE & FIREMEN'S RETIREMENT
SYSTEM, RESPONDENT–RESPONDENT.

DENNIS M. KEENAN, PETITIONER–APPELLANT, v. BOARD
OF TRUSTEES, POLICE & FIREMEN'S RETIREMENT
SYSTEM, RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 14, 2007—Decided June 12, 2007.

Before Judges LINTNER, S.L. REISNER and C.L. MINIMAN.

*Charles J. Uliano* argued the cause for appellant Abraham Hemsey (*Chamlin, Rosen, Uliano & Witherington,* attorneys; *Mr. Uliano,* of counsel; *Andrew T. Walsh,* on the brief).

*Samuel J. Halpern* argued the cause for appellant Dennis M. Keenan.

*Eileen S. Den Bleyker,* Deputy Attorney General, argued the cause for respondent (*Stuart Rabner,* Attorney General, attorney; *Michael Haas* and *Patrick DeAlmeida,* Assistant Attorneys General, of counsel; *Ms. Den Bleyker* and *Susanne Culliton,* Deputy Attorneys General, on the briefs).

The opinion of the court was delivered by

S.L. REISNER, J.A.D.

Dennis M. Keenan and Abraham Hemsey appeal from unfavorable final decisions of the Board of Trustees (Board) of the Police and Firemen's Retirement System (PFRS). Because the decisions were based on the same hearing record and concern related legal issues, we have consolidated their appeals for purposes of this opinion.

Based on our decision in *Kossup v. Board of Trustees, Police & Firemen's Retirement System,* 372 *N.J.Super.* 468, 859 *A.*2d 721 (App.Div.2004), we affirm the Board's decision that Keenan was required to re-enroll in PFRS when he retired as Trenton's Fire Chief on May 31, 1998, and on the next day was re-hired as Trenton's Public Safety Director. However, we conclude that the Board was estopped from requiring Keenan to repay approximately $450,000 in pension benefits that he received prior to the

Board's decision, because the undisputed record evidence establishes that Keenan accepted the Public Safety Director position in good faith reliance on advice from the Division of Pensions that he could do so without affecting his PFRS pension.

We affirm the Board's decision in Hemsey's case, because Hemsey, who retired as a police officer on October 1, 1998, was re-hired three months later as a "consultant" performing substantially the same functions that he had been performing before he retired. We agree with the Board that Hemsey served as an employee under the contract, and that Hemsey did not produce sufficient evidence to support a claim of estoppel.

## I

Keenan appeals from a Board decision dated November 15, 2005, requiring him to re-enroll in PFRS and repay approximately $450,000 in pension benefits. Keenan retired from the PFRS-covered position of Fire Chief for the City of Trenton on May 31, 1998, but he was appointed on June 1, 1998, to the position of Trenton Public Safety Director.[1] On July 12, 1999, Keenan was appointed as Fire Director, after the Public Safety Director position was abolished by referendum.

In *Kossup, supra,* 372 *N.J.Super.* at 473–74, 859 *A.2d* 721, we recognized that in order to benefit police and firefighters, the Legislature enacted *N.J.S.A.* 43:16A–3.1, which allows such employees to maintain their very valuable membership in PFRS when they accept promotions to certain civilian positions such as public safety director or fire director.[2] *See also Jordan v. Har-*

---

[1] While employed as Fire Chief, Keenan also served temporarily as Acting Public Safety Director from January 1998 to May 31, 1998, with no additional compensation. After retiring as Fire Chief, Kossup was given a permanent, paid appointment to the Public Safety Director position.

[2] *N.J.S.A.* 43:16A–3.1 provides as follows:

Service with a law enforcement unit or firefighting unit ... in an appointive capacity with administrative or supervisory duties over policemen or

*vey,* 381 *N.J.Super.* 112, 118–19, 885 *A.2d* 14 (App.Div.2005). The civilian positions are ordinarily covered by a different pension system with less-generous retirement benefits. However, *N.J.S.A.* 43:16A–3.1 gives these positions a "hybrid" status whereby a PFRS member who accepts such a position within six months after leaving a regular PFRS-covered job can remain in PFRS while serving in the civilian position. *Kossup, supra,* 372 *N.J.Super.* at 476–77, 859 *A.2d* 721.

In addition to construing section 3.1, *Kossup* addressed *N.J.S.A.* 43:16A–15.3, which prevents "double dipping" by requiring a PFRS member who retires and then obtains new employment in a PFRS-covered position to re-enroll in PFRS.[3] *Kossup, supra,* 372 *N.J.Super.* at 477–78, 859 *A.2d* 721. In *Kossup* we recognized that ordinarily an employee who retires from a PFRS-covered position and within six months of retirement takes a civilian police or fire director position, would be required to re-enroll in PFRS. *Ibid.* Kossup, however, was not subject to this requirement because he had reached the mandatory retirement age of sixty-five and, therefore, could not re-enroll in PFRS when he accepted a civilian director position. *Id.* at 478, 859 *A.2d* 721. Hence, we concluded that, for Kossup, the civilian director position was not a PFRS-covered position and he did not have to rescind his retirement and re-enroll in PFRS pursuant to *N.J.S.A.* 43:16A–15.3. *Kossup, supra,* 372 *N.J.Super.* at 478, 859 *A.2d* 721.

---

firemen or any combination thereof by any person who not more than six months prior to such service served as a member of that or any other law enforcement unit or firefighting unit ... shall be deemed to be service as a member under and for all the purposes of the provisions of the act of which this act is a supplement.

[3] *N.J.S.A.* 43:16A–15.3 provides in relevant part:

If a former member of the retirement system who has been granted a retirement allowance for any cause other than disability, becomes employed again in a position which makes him eligible to be a member of the retirement system, his retirement allowance and the right to any death benefit as a result of his former membership, shall be canceled until he again retires.

Unlike Kossup, Keenan retired voluntarily before reaching age sixty-five and he thus was still eligible to re-enroll in PFRS when, on the same day his retirement allowance commenced, he accepted the civilian position of Public Safety Director. We find no merit in Keenan's contention that the director job was not the type of position to which *N.J.S.A.* 43:16A–3.1 would apply. *See Kossup, supra,* 372 *N.J.Super.* at 474–75, 859 *A.2d* 721; *Jordan, supra,* 381 *N.J.Super.* at 118–19, 885 *A.2d* 14. *See also Sponsor's Statement to S. 579* (enacted as L.2000, c. 166) (acknowledging that "under current law" *N.J.S.A.* 43:16A–3.1 applied to public safety director positions).

There is substantial credible evidence in the record to support the Board's conclusion that the Public Safety Director "had supervisory and administrative authority over police and fire personnel that included the ability to appoint the police and fire chiefs as well as conduct the major disciplinary hearings for police and fire personnel." *See Campbell v. N.J. Racing Comm'n,* 169 *N.J.* 579, 587, 781 *A.2d* 1035 (2001); *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.2d* 686 (1980). *See also N.J.S.A.* 43:16A–3.1. Keenan conceded that the Director's duties also included setting "policy that applied to all three divisions" of the department namely "police, fire and communications." Therefore, the Board correctly concluded that for Keenan the position was a PFRS-covered position under *N.J.S.A.* 43:16A–3.1, and *N.J.S.A.* 43:16A–15.3 required Keenan to re-enroll in PFRS. There is no dispute that the Fire Director position that Keenan accepted in July 1999, was also the type of administrative or supervisory job to which *N.J.S.A.* 43:16A–3.1 would apply. *See Kossup, supra,* 372 *N.J.Super.* at 476–78, 859 *A.2d* 721.

While we agree with the Board that Keenan was required to re-enroll in PFRS, we part company with the Board on the requirement that Keenan repay approximately $450,000 in retirement benefits he had already received. While mindful of the limited scope of our review of an agency's factual findings, we do not simply rubber-stamp those findings, and our review of the

agency's legal conclusions is considerably less deferential. *See id.* at 472–73, 859 *A.*2d 721; *Fairweather v. Pub. Employees' Ret. Sys.,* 373 *N.J.Super.* 288, 295, 861 *A.*2d 186 (App.Div.2004). In this case, we conclude that the Board's factual findings on the estoppel issue are not supported by the record, and its legal conclusions based on that erroneous factfinding cannot be sustained.

The undisputed evidence adduced at Keenan's administrative hearing established that before Keenan accepted the Public Safety Director job, he consulted with a secretary in the City's Public Safety Department, who gave him "a copy . . . of a letter from the Pension Board to [another police officer who had retired and immediately taken a public safety director position] saying that . . . they have looked at the position and because of that, he was able to retire and take the position . . . without jeopardizing his pension."

Keenan then consulted a pension counselor in the State Division of Pensions and Benefits to ensure that his acceptance of the Public Safety position would not interfere with his right to receive his Fire Department pension. Though he did not recall the individual's name, Keenan remembered "he was a retired Newark City Fire Captain who was working towards his second pension in PERS [Public Employees' Retirement System]" and recommended that Keenan enroll in "another State Pension Fund . . . while you're still working, [so that] you would be able to work towards a second pension." He told Keenan that the Public Safety Director position fell under the PERS not the PFRS. Keenan stated he was not interested in working long enough to get involved with a second pension, but gave the counselor all his information. He was assured that his new position "would not affect [his PFRS pension] at all." "[A]s a result of these conversations," Keenan accepted the Public Safety Director position, a civilian job, serving "at the pleasure of the Mayor."

Keenan likewise exercised due diligence before accepting the Fire Director position, by consulting the Division of Pensions.

According to Keenan, in November or December of 1998, he became aware of the dispute over Kossup's PFRS pension. In light of this, Keenan contacted "the Pension [sic], and I talked to Jo[Ann] Martin," whom he believed was the Administrative Secretary of the Board, and

> explained what was happening in Trenton. Of course, her being in Trenton, she sort of knew from the papers what was going on, and I said, based on what's happening with Kossup, do I have a problem if I accept the new job of ... Fire Director. And she said, "No." The law had been rewritten over the past year or so. I don't know the exact date. And that now there was a provision in there that specified that you could not take a job that could qualify as Police and Fire Pension for a period of six months after you retire. And she said that since you have been retired effectively now for 13 months this does not apply to you at all, and you're free to accept the position of Fire Director.
>
> So twice I relied on the advice and the information from the Division of Pensions before I made any move.

Keenan accepted the Fire Director job based on these assurances.

Although Martin did not testify at Keenan's hearing, Keenan offered in evidence an August 9, 2002 letter from Martin to the City and an October 15, 2002 memorandum from Martin to the Board, both confirming the assurances Keenan had received about his ability to accept the Public Safety and Fire Director positions without losing his pension. Those documents were admitted in evidence without objection from the State.

Martin's memo to the Board specifically confirmed the earlier assurances to Keenan that his post-retirement roles in city government would have no bearing on his pension, and asked that the Board advise her on how to proceed given a pending inquiry about Keenan's status.[4] She explained that the question of Keenan's employment and PFRS involvement originally arose

> shortly after Director Keenan's retirement.... The City of Trenton responded back to this office indicating that he retired as the Fire Chief and was hired back as the Public Safety Director. On paper, this position had some non-PFRS groups reporting to him. Regina and I reviewed this and based on the information that

---

[4] Apparently, certain union members sent an anonymous letter to the Board complaining about Keenan, Hemsey and other employees who had retired from city government and had later been re-hired in other positions.

was provided by the City of Trenton, he was administratively approved to continue working.

There is no dispute in the record that JoAnn Martin was an administrative analyst with the Division of Pensions and Benefits. Nothing in the record suggests that she was not a proper person for Keenan to consult for pension advice or that he would not have acted reasonably in relying on her advice.

■ While Martin's writings are hearsay, and were not authenticated as business records, they appear highly reliable. Nothing in the record suggests any reason why she would do otherwise than accurately report the substance of her advice to Keenan. Under the residuum rule, *N.J.A.C.* 1:1–15.5(b), hearsay is admissible in administrative hearings to corroborate other, non-hearsay evidence. *See In re Tenure Hearing of M. William Cowan,* 224 *N.J.Super.* 737, 750, 541 *A.*2d 298 (App.Div.1988). In this case, Martin's letters were properly admitted to corroborate Keenan's unrebutted testimony about the advice he received from the Division of Pensions. The administrative law judge (ALJ) erred in discounting these letters as "hearsay not subject to an exception" and "not competent, credible evidence that can be used to form the basis of a decision." He thus incorrectly concluded that there was no corroboration for Keenan's testimony.

The Board erroneously relied on the ALJ's conclusions in this regard and also erroneously concluded that the ALJ "did not accord ... Mr. Keenan any finding of credibility." Actually, the ALJ made no specific finding as to Keenan's credibility. We conclude that the record contains only Keenan's undisputed evidence on this issue, including official corroboration from Martin, that he sought and received advice from the Division of Pensions as he claims he did. In light of that undisputed evidence, we conclude that while the Board's order requiring prospective compliance with *N.J.S.A.* 43:16A–15.3 was proper, the Board was equitably estopped from entering an order requiring Keenan to repay several years' worth of pension benefits.

 The doctrine of equitable estoppel precludes a party "from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon" that party's voluntary conduct. *Summer Cottagers' Ass'n v. City of Cape May*, 19 *N.J.* 493, 503–04, 117 *A.2d* 585 (1955). *See also W.V. Pangborne & Co. v. N.J. Dep't of Transp.*, 116 *N.J.* 543, 553, 562 *A.2d* 222 (1989). The doctrine is rarely invoked against the government unless required to prevent manifest injustice:

> Equitable estoppel is rarely invoked against a governmental entity, *Cipriano v. Department of Civil Serv.*, 151 *N.J.Super.* 86, 91, 376 *A.2d* 571 (App.Div.1977), particularly when estoppel would "interfere with essential governmental functions." *Vogt v. Borough of Belmar*, 14 *N.J.* 195, 205, 101 *A.2d* 849 (1954). Nonetheless, equitable considerations are relevant to assessing governmental conduct, *Skulski v. Nolan*, 68 *N.J.* 179, 198, 343 *A.2d* 721 (1975), and may be invoked to prevent manifest injustice, *Vogt v. Borough of Belmar, supra*, 14 *N.J.* at 205, 101 *A.2d* 849. [*O'Malley v. Dep't of Energy*, 109 *N.J.* 309, 316, 537 *A.2d* 647 (1987).]

 Our Supreme Court has recently reiterated that "manifest injustice provides an exception to the general rule" that "equitable estoppel is rarely invoked against a governmental entity." *Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs*, 186 *N.J.* 5, 20, 890 *A.2d* 922 (2006) (quotations and citations omitted). "Equitable estoppel may be invoked against a municipality where interests of justice, morality and common fairness clearly dictate that course ... [and] will be applied in the appropriate circumstances unless the application would prejudice essential governmental functions." *Middletown Twp. Policemen's Benevolent Ass'n Local No. 124 v. Twp. of Middletown*, 162 *N.J.* 361, 367, 744 *A.2d* 649 (2000) (quotations and citations omitted). The party asserting the right to estoppel bears the burden of proof. *Palatine I v. Planning Bd. of Montville*, 133 *N.J.* 546, 562, 628 *A.2d* 321 (1993), *overruled in part on other grounds, D.L. Real Estate Holdings, L.L.C. v. Point Pleasant Beach Planning Bd.* 176 *N.J.* 126, 135, 820 *A.2d* 1220 (2003); *Virginia Constr. Corp. v. Fairman*, 39 *N.J.* 61, 72, 187 *A.2d* 1 (1962).

Applying these principles here, we conclude that Keenan reasonably exercised due diligence in consulting with the Division of

Pensions before accepting his new administrative positions. A decision to retire, or to accept a new job which might jeopardize receipt of pension benefits, may have enormous financial ramifications. *See Middletown, supra,* 162 *N.J.* at 372, 744 *A.*2d 649. Public employees should be able to rely on advice they receive on these issues from the Division of Pensions. Where, as here, a public employee presents undisputed, reliably corroborated evidence that he received and relied in good faith on mistaken advice from the Division of Pensions in making a decision affecting his retirement, it would be manifestly unjust to permit the State years later to require that employee to repay pension benefits he received. In this case, Keenan would be required to repay approximately $450,000. We conclude that in the circumstances of this case the State is estopped from imposing this financially ruinous requirement. *See Skulski v. Nolan,* 68 *N.J.* 179, 208, 343 *A.*2d 721 (1975). *See also Indursky v. Bd. of Trs. of Pub. Employees' Ret. Sys.,* 137 *N.J.Super.* 335, 343–44, 349 *A.*2d 86 (App.Div.1975).

On the other hand, we find no basis to apply estoppel on a prospective basis. We have previously recognized that "[t]he pension statute is carefully drawn to protect the integrity of the public and contributed funds from which pensions are paid." *Tubridy v. Consol. Police & Firemen's Pension Fund Comm'n,* 84 *N.J.Super.* 257, 263, 201 *A.*2d 736 (App.Div.1964). Consequently, "[a]dministrative errors by officials in respect of such funds, which are a public trust, cannot on the theory of estoppel be permitted to aggrandize the specific statutory rights of qualified pensioners into illegal depletions of such funds for their private benefit." *Ibid.* As we observed in *Tubridy,* a plaintiff's good faith reliance must be weighed against the public interest involved, and "each case stands on its own facts." *Id.* at 264, 201 *A.*2d 736. *See also Skulski, supra,* 68 *N.J.* at 197, 343 *A.*2d 721. In this case, denying prospective relief will not permanently deprive Keenan of his pension but simply delays his receipt of benefits.[5] *Cf. Middle-*

---

[5] At oral argument, Keenan's attorney asserted, as an additional ground for prospective relief, that when Keenan eventually retires his pension will be based

*town, supra,* 162 *N.J.* at 371–72, 744 *A.2d* 649 (applying equitable estoppel prospectively where a retired police officer would otherwise be unable to obtain free health benefits for his family). Weighing the potential harm to the financial integrity of the pension system in permitting an employee to continue to receive pension benefits not allowed by statute versus the harm to the employee, we find no equitable basis to preclude the Board from requiring Keenan to re-enroll in PFRS. *See Tubridy, supra,* 84 *N.J.Super.* at 263, 201 *A.2d* 736.

Accordingly, we affirm the Board's determination that Keenan must re-enroll in PFRS, and we reverse the agency's decision that Keenan must repay the benefits he has already received.

## II

We turn next to Hemsey's appeal from a Board decision dated November 15, 2005, requiring him to re-enroll in PFRS and repay $156,303.91 in retirement benefits.

We begin by summarizing the testimony produced at Hemsey's administrative hearing. Hemsey was employed as a patrolman detective. At the time he retired on October 1, 1998, he was assigned to the Communications Division of the Trenton Police Department. It was clear from his testimony that while Hemsey's police career did not involve functions typically associated with police officers, such as investigating crimes, he carried out jobs essential to the police department.

---

on his salary as Fire Director which is lower than his previous salary as Fire Chief. That issue is not properly before us because it was not addressed in Keenan's brief. However, based on our reading of *N.J.S.A.* 43:16A–15.3, counsel's contention may be incorrect. The statute addresses the pension calculation for an employee who retires and is then required to re-enroll in PFRS. "Upon subsequent retirement of such member, his former retirement allowance shall be reinstated based on his former membership. In addition, he shall receive an additional retirement allowance based on his subsequent service as a member...." *Ibid.* Our decision of this appeal does not preclude Keenan from pursuing, if necessary, a future legal or equitable claim concerning the correct amount of his pension at such time as he again retires.

Hemsey explained that until 1995, he was assigned as a "sworn dispatcher." As part of a 1989 decision to have civilians rather than police officers serve as dispatchers, Hemsey was removed from his dispatch job in 1995, and "was put on a special detail, and that was to build a . . . geographic file of every address in the city in preparation of automating our system and going into a . . . computer aided dispatch system." He worked on this project for about two years. He also explained that at that time the Division of Communications in which he worked was part of the Department of Public Safety with a police lieutenant as "the commanding officer." [6] Until Hemsey retired on October 1, 1998, the commanding officer was Lieutenant John Milizar. According to Hemsey, he and Milizar retired at the same time.

In December 1998, Keenan, who was then the Acting Public Safety Director, contacted Hemsey and asked him if he "had any interest in returning in a civilian capacity to assist in the day-to-day operations of Communications." Hemsey declined at the time because "there was a residency requirement for civilian employees" and he was not a resident. Hemsey testified that to avoid the residency requirement, on December 17, 1998, the City Council authorized what Hemsey characterized as "a consulting contract." Hemsey began working pursuant to the contract on January 11, 1999.

Hemsey testified that as a "communications consultant" he "was responsible for looking at systems, both radio, 9-1-1 related equipment" and other systems that supported the 9-1-1 system, and making recommendations "to the commanding officer and to the city administration what systems were weak, were redundancies, didn't exist, and so forth. . . . I reported on the formal report

---

[6] On cross-examination, Hemsey clarified that as a police officer he worked in the Communications Center which was physically located in the Police Department. He also explained that before 1989, the "dispatch function" was "under the chief of Police" and "only dealt with Police." In 1989, the dispatch function was placed in the Department of Public Safety under control of the "civilian director of Public Safety" rather than under the police chief.

monthly to the commanding officer, as well as to the deputy director of Public Safety, my progress ... and my recommendations." Hemsey testified that he worked as a consultant through July 11, 1999. He reported his consulting income to the Division of Pensions.

The December 31, 1998 letter offering Hemsey the consulting job stated that "[u]nder the direction of the [Trenton Police Department] Commanding Officer, Lieutenant Gary Thacker and Fire Captain Donald Kanka," Hemsey would "evaluate and work with a group of Trenton City Police and Fire Communication Center personnel, including line supervisors, in a centralized communications center environment." The letter indicated he would be "operating and training all subordinate employees in the operation of a variety of communications equipment."

Hemsey insisted, however, that he did not report to Lieutenant Thacker or Captain Kanka. Rather, he would communicate with them in the course of doing his job. However, he admitted that when he reported to work he reported to Communications and that Lieutenant Thacker was the commanding officer of Communications.[7] He also clarified that the reason the City needed him to work as a consultant was for the creation of a computerized emergency dispatch system. As a consultant, Hemsey was supervised by the Deputy Director of Public Safety, George Clisby.

Hemsey testified that on or about July 12, 1999, the City abolished the Department of Public Safety and moved the Communications Division to the Department of Administration, which was separate from the Police Department. Contemporaneously, on July 12, 1999, some nine months after he retired, Hemsey was appointed Director of Communications in the Communications Division that was now part of the Department of Administration. As Director, Hemsey administered the budget, and served as a

---

[7] In reviewing the record, we note that on cross-examination Hemsey repeatedly offered lengthy explanations to simple questions, seemingly to avoid giving a direct answer.

hearing officer, "so I controlled the discipline." He also was in charge of purchasing, in consultation with his civilian supervisor, the Business Administrator. Hemsey testified that he "was able to hire, fire during these disciplines, recommend change, implement change, set policy, all of which I could never do as a police officer." He testified that he did not supervise any "Police or Fire personnel" in his new job or in his consulting job. However, evidence was introduced at the hearing that some police and fire personnel did work in the Communications Division and the Division served the communications needs of the police and fire departments.

Hemsey served as Communications Director until October 24, 2002, when he became the interim Police Director. As of the date of the hearing in November 2004, Hemsey was Chief of Administrative Services for the Trenton Police Department.

According to Hemsey, on November 28, 2001, he received a letter indicating that there was an investigation concerning his employment and pension status. In 2002, Hemsey responded to a questionnaire aimed at determining whether he was an employee or an independent contractor while he was working under the consulting contract. By letter dated October 22, 2002, the Board concluded that "Mr. Hemsey performed essentially the same PFRS job duties [while a consultant] that he held as an active member of the system prior to his retirement in October 1998." As a result he was required to re-enroll in the PFRS and the agency sought to recoup $156,303.91 in pension benefits. Hemsey requested an administrative hearing to challenge this determination.

After the hearing, an ALJ concluded that Hemsey was an employee rather than an independent contractor. The ALJ premised that decision on the language of the contract itself, which was titled "Trenton City Employment Contract." The ALJ also considered that Hemsey's duties included evaluating and working with police and fire personnel "and training all subordinate employees." The ALJ concluded that Hemsey had "administrative

and supervisory duties" over "police and fire personnel assigned to the Communication[s] Center." The ALJ rejected Hemsey's claim of equitable estoppel.

In a written decision dated November 15, 2005, the Board adopted the ALJ's conclusions, but added their conclusion that Hemsey's "self-serving" testimony concerning his job duties was not credible. The Board concluded that Hemsey's duties under the contract were to be performed in the Communications Center under the direction of Lieutenant Thacker and Fire Captain Kanka. The Board also reasoned, "[m]ore importantly, because the Communications Division was still maintained within the Police Department at that time, Mr. Hemsey's duties indicate that he supervised active-duty police and fire personnel in the use of the communications equipment." The Board also determined that the twenty-factor Internal Revenue Service (IRS) test should be used to determine Hemsey's status as an employee or an independent contractor, and concluded that Hemsey's work met thirteen out of the twenty criteria for an employee. Finally, the Board concluded that "the position of Director of Communications was PFRS eligible as to Mr. Hemsey because he continued employment in an administrative or supervisory capacity over the Police Department."

As previously noted, we will not disturb the agency's decision so long as it is supported by sufficient credible evidence and is consistent with applicable law. *See Henry v. Rahway State Prison, supra,* 81 *N.J.* at 579–80, 410 *A.*2d 686; *Fairweather, supra,* 373 *N.J.Super.* at 295, 861 *A.*2d 186. Having reviewed the record, we conclude that the Board's decision meets that standard and must be affirmed.

The essence of the Board's decision is that Hemsey was not an independent contractor but rather continued as an employee, pursuant to a contract, performing the same basic duties he performed before he retired. Thus, under *N.J.S.A.* 43:16A–15.3, he was required to re-enroll in PFRS and his retirement benefits "shall be canceled until he again retires." *Ibid.* In construing an

analogous provision of the statute governing the PERS, *N.J.S.A.* 43:15A–57.2, we observed that "[t]he purpose [of this provision] is to prevent professionals from manipulating the pension system by working part-time for governmental agencies while receiving a public pension." *Stevens v. Bd. of Trs. of Pub. Employees' Ret. Sys.,* 309 *N.J.Super.* 300, 303, 706 *A.*2d 1191 (App.Div.1998).

As in *Stevens,* we find no legal impediment to the Board's use of the twenty-factor IRS test for determining whether a person is serving as an employee or an independent contractor. *Id.* at 304, 706 *A.*2d 1191. Hemsey's argument that use of the test violated the Administrative Procedure Act may not be asserted on appeal because it was not raised before the Board, but if we consider the argument it is without merit. *See ibid.* The Board provided a detailed factual explanation for its conclusion that Hemsey was acting as an employee. The record supports the Board's conclusion. Notably, Hemsey did not explain how his work as a "consultant" differed from the work he was doing before he retired. Moreover, even on a cold record, Hemsey's testimony appeared evasive and, therefore, less than credible.

If as the Board concluded, Hemsey returned to work in a PFRS-covered position on January 11, 1999, his retirement was properly canceled and he was required to continue as an active member of PFRS "until he again retires." *N.J.S.A* 43:16A–15.3. This statutory requirement would appear to render moot the issue of whether Hemsey's next job as Director of Communications was a PFRS-covered position under *N.J.S.A.* 43:16A–3.1, since he did not "again retire" and in fact took on the role of interim Police Director in 2002. However, we also conclude that there is sufficient evidence in the record to support the Board's conclusion that, for Hemsey, the Director of Communications position was a PFRS-covered position. That job involved administrative or supervisory duties over those police and fire personnel who worked in the Communications Division, and the communications function remained an integral part of the police and fire departments

although the Division itself had been moved into the Department of Administration. *See N.J.S.A.* 43:16A–3.1.

Finally, we conclude that Hemsey's claim of equitable estoppel is not supported by record evidence. There is no evidence that Hemsey consulted with the Division of Pensions before entering into the contract with the City. The fact that he reported his contract income to the Division of Pensions does not create an estoppel. His appellate contentions on this issue do not warrant further discussion in a written opinion. *R.* 2:11–3(e)(1)(E).

Affirmed.