963 A.2d 865 (2009)
405 N.J. Super. 132
EAST ORANGE BOARD OF EDUCATION, Plaintiff-Appellant,
v.
NEW JERSEY SCHOOLS CONSTRUCTION CORPORATION and The New Jersey Economic Development Authority, Defendants-Respondents.
No. A-6597-05T1
Superior Court of New Jersey, Appellate Division.
Argued December 17, 2008.
Decided February 3, 2009.
*866 Stephen J. Edelstein, Florham Park, argued the cause for appellant (Schwartz Simon Edelstein Celso & Kessler, LLC, attorneys; Mr. Edelstein, of counsel; Christopher R. Welgos, Hope R. Blackburn and Nicholas J. Dotoli, on the briefs).
Sookie Bae, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Melissa H. Raksa, Deputy Attorney General, of counsel; Ms. Bae, on the brief).
Before Judges RODRÍGUEZ, WAUGH and NEWMAN.
The opinion of the court was delivered by
WAUGH, J.S.C. (temporarily assigned).
Plaintiff East Orange Board of Education (Board) seeks an order to compel defendants New Jersey Schools Construction Corporation (SCC) and New Jersey *867 Economic Development Authority (EDA) to proceed with certain school construction and renovation projects that have been delayed because of an overall shortage of funds available for such projects statewide. The litigation was initiated in September 2005 as an action in lieu of prerogative writs, R. 4:69, filed in the Law Division, Essex County. In March 2006, defendants successfully moved for transfer of the action to Mercer County. In June 2006, they successfully moved for transfer to the Appellate Division. The Board appealed that order. We denied the defendants' motion for summary disposition by order dated September 16, 2008. We now affirm the order transferring the matter to this court and dismiss the complaint, on its merits, with prejudice.

I
Before turning to the specific facts of this case, it will be helpful to explore its underlying historical and legislative background.

A. The Educational Facilities Construction and Financing Act

The Educational Facilities Construction and Financing Act (EFCFA), N.J.S.A. 18A:7G-1 to -48, was enacted in 2000 to address problems with public school facilities statewide, but particularly in certain districts requiring enhanced financial assistance from the State, commonly referred to as Abbott districts. N.J.S.A. 18A:7G-2. See Abbott v. Burke, 153 N.J. 480, 523-525, 710 A.2d 450 (1998) (Abbott V). The EFCFA established a comprehensive mechanism for the planning, financing, and construction of certain school projects. Initially, the EDA was the only public agency responsible for the implementation of EFCFA.
The EFCFA provides for the funding of capital projects through the issuance of bonds by the EDA. N.J.S.A. 18A:7G-14. The debt service for the bonds is paid out of the General State Fund, subject to appropriation, pursuant to contracts between the EDA and the State Treasurer. N.J.S.A. 18A:7G-17; Lonegan v. State, 174 N.J. 435, 459, 809 A.2d 91 (2002).[1] For an SDA district,[2] which would include an Abbott district such as East Orange, the State share of eligible costs is one hundred percent. N.J.S.A. 18A:7G-5(k). See Abbott v. Burke, 164 N.J. 84, 90, 751 A.2d 1032 (2000) (Abbott VII).
The SCC was established as a subsidiary of the EDA pursuant to Executive Order No. 24, 34 N.J.R. 2888(a), which was signed by Governor James E. McGreevy on July 29, 2002. The SCC assumed responsibility for the planning and construction aspects of the EFCFA, while the EDA itself remained involved with the financial aspects.
In 2005, the SCC determined that it would have insufficient capital funds remaining to complete all of the school facilities projects in the Abbott districts. Of the $6 billion that had originally been made available for Abbott district school construction projects through the issuance of bonds by the EDA, only $1.4 billion remained unspent by mid-July 2005. See Abbott v. Burke, 185 N.J. 612, 613-14, 889 A.2d 1063 (2005) (Abbott XIV).
That insufficiency led to "a prioritization of projects to be completed with the remaining *868 funds." N.J.S.A. 52:18A-235(e). A special committee consisting of representatives of the SCC, the Office of the Governor, the Attorney General, and the Department of Education developed a list of fifty-nine Abbott district projects to be given priority for completion by the SCC. The list was approved at the SCC's July 27, 2005, meeting. In 2007, it became apparent that there were not sufficient capital funds remaining to complete even the fifty-nine priority projects. At its April 25, 2007, meeting, the SCC adopted a capital deferral plan, which deferred construction of twenty-seven of the fifty-nine projects.
Following a report from the State Inspector General with regard to its operations, the SCC was abolished in 2007 and replaced by a statutorily created entity, the New Jersey Schools Development Authority (SDA). N.J.S.A. 52:18A-237 (creating the SDA); N.J.S.A. 52:18A-247 (abolishing the SCC and transferring duties and powers to the SDA). The EDA retained its role with respect to the funding of the projects. N.J.S.A. 18A:7G-5(a). To avoid confusion, we will refer generally to the SCC and SDA as the "development authority," unless the context requires a more specific reference.
The reasons for the creation of the SDA were set forth in N.J.S.A. 52:18A-235:
The Legislature finds and declares that:
a. The Constitution of the State of New Jersey requires the Legislature to provide for the maintenance and support of a thorough and efficient system of free public schools and this legislative responsibility includes ensuring that students are educated in physical facilities that are safe, healthy, and conducive to learning.
b. Inadequacies in the quality, utility, and safety of educational facilities among school districts of this State, and particularly in Abbott districts, led to the enactment of the "Educational Facilities Construction and Financing Act," [N.J.S.A. 18A:7G-1 to -48]. That law authorized the New Jersey Economic Development Authority to undertake a comprehensive school construction and financing program, including the funding, designing, and constructing of school facilities for the Abbott districts and certain other types of districts.
c. The New Jersey Schools Construction Corporation was created in August 2002 as a subsidiary of the New Jersey Economic Development Authority pursuant to the provisions of [N.J.S.A. 34:1B-159] and Executive Order No. 24 of 2002 to, among other things, focus, coordinate, and centralize the efforts to design and construct school facilities in the Abbott districts and certain other types of districts.
d. In February 2005, an investigation of the activities of the New Jersey Schools Construction Corporation was undertaken by the Inspector General. The Inspector General found that structural and operational problems at the corporation were impeding the progress of the school construction program and made recommendations for actions to improve the program.
e. The corporation initiated reform efforts to implement the recommendations of the Inspector General. While undertaking these reform efforts and continuing to undertake the design and construction of school facilities projects, it was determined that there would be insufficient funding available under the "Educational Facilities Construction and Financing Act" to complete all the school facilities projects in the Abbott districts. A joint effort by the New Jersey Schools Construction Corporation and the Department of Education *869 resulted in a prioritization of projects to be completed with remaining funds.
f. Governor Jon S. Corzine issued Executive Order No. 3 of 2006 in February 2006 which created an Interagency Working Group on School Construction to study management reforms and legislative action necessary to improve the school construction program.
g. The Interagency Working Group on School Construction recommended statutory changes including the creation of a new school construction authority with a specific focus on Abbott district construction, a governance structure tailored to its mission, project implementation requirements to ensure that projects are undertaken consistent with educational priorities, land acquisition and procurement reforms to improve efficiencies, provide flexibility, and control costs, and a greater role and responsibility given to the Abbott districts in managing certain types of projects.
h. The initiatives provided herein implement the recommendations of the Interagency Working Group on School Construction with regard to the creation of a new school construction authority and the undertaking of projects for and by Abbott districts so as to ensure that the agency undertaking the school construction program has adequate internal controls, processes, and procedures to undertake additional school facilities projects; and the initiatives also provide opportunities for the Abbott districts, the public, and stakeholders to provide input during the various phases of the construction of school facilities projects.

B. Project Approval Process

The EFCFA sets out a detailed process for the proposal, review, and approval of school construction projects. See also N.J.A.C. 6A:26-3.1 to -3.17. Pursuant to N.J.S.A. 18A:7G-4(a), each school district was required to submit a long range facilities plan (LRFP) detailing "the district's school facilities needs and the district's plan to address those needs for the ensuing five years." The first such LRFP was due on December 15, 2000. Ibid. Each district's LRFP is subject to the review and approval of the Commissioner of Education (Commissioner). N.J.S.A. 18A:7G-4(i). The LRFP is to be updated at least once every five years to ensure it accurately reflects the capacities, needs, and conditions within the district, but it may be amended at any time with the approval of the Commissioner. N.J.S.A. 18A:7G-4(a),(c).
Pursuant to N.J.S.A. 18A:7G-5(d)(1), an SDA district seeking to fund a project must submit a detailed application to the Commissioner. For a project in an SDA district, the Commissioner may authorize the development authority to undertake "preconstruction activities" such as "site identification, investigation, and acquisition, feasibility studies, land-related design work, design work, site remediation, demolition, and acquisition of temporary facilities," to assist the district in the preparation of its application. N.J.S.A. 18A:7G-5(d)(2).
If the Commissioner determines that a project meets, among other factors, the facilities efficiency standards and the district's LRFP, N.J.S.A. 18A:7G-5(e), the Commissioner must then create a cost estimate for the project. N.J.S.A. 18A:7G-5(f). The Commissioner has some discretion to approve projects which in some way fail to conform to the statutory standards and districts are permitted to pay costs exceeding the budgetary allowance out of their own funds. N.J.S.A. 18A:7G-5(g)(3).
For an SDA district project, the Commissioner must prepare a preliminary report describing the project along with, *870 among other factors, its costs and priority ranking. N.J.S.A. 18A:7G-5(h)(2). After receiving the Commissioner's preliminary report, the development authority must submit to the Commissioner detailed recommendations with regard to the project. N.J.S.A. 18A:7G-5(i). The Commissioner and the development authority then work together to determine what changes must be made before a project receives final approval. Ibid. Such recommendations address any changes necessary to meet cost or school-facility standards. Ibid. The development authority may recommend the projected cost estimate be increased to ensure compliance with school-facility standards or apportion excess costs to the district where the costs are attributable to factors within the district's control. Ibid.
No construction may commence until the Commissioner "transmits to the development authority a final project report and the district complies with the approval requirements for the local share, if any, pursuant to [N.J.S.A. 18A:7G-11]." N.J.S.A. 18A:7G-5(j). The final project report must "contain all of the information contained in the preliminary project report and, in addition, shall contain: the final eligible costs; the excess costs, if any; the total costs which equals the final eligible costs plus excess costs, if any; the State share; and the local share." Ibid.
The 2007 amendments to the EFCFA, L. 2007, c. 137, § 20, required the Commissioner to create "an educational facilities needs assessment for each SDA district" and an educational priority ranking of all school facilities projects within the district. N.J.S.A. 18A:7G-5(m). The development authority, in consultation with the Commissioner, was then required to "establish a Statewide strategic plan to be used in the sequencing of SDA district school facilities projects based upon the projects' educational priority rankings and issues which impact the development authority's ability to complete the projects including, but not limited to, the construction schedule and other appropriate factors." Ibid.

C. The Relevant Facts

We now turn to the facts of this case. The parties have generally stipulated to the facts and the record.
In 2001, the Commissioner approved the Board's initial LRFP for the East Orange School District. The preliminary cost estimate was $255,112,669. Seven amendments to the LRFP were approved during the period running from April 2001 to January 2005. The LRFP, as amended, described fifteen projects including the construction of four new schools, the renovation of five schools, and the replacement of six schools. Although, as noted below, several projects have actually entered the construction phase, the record does not reflect the issuance of any final project reports, which are required for construction to commence pursuant N.J.S.A. 18A:7G-5(j). Consequently, it is not clear how many of the Board's projects actually reached that stage.
Two of the Board's projects, the Mildred Barry Garvin Elementary School and Elementary School No. 5, were among the fifty-nine priority projects resulting from the SCC's reprioritization process described above. They were not deferred under the 2007 capital deferral plan. They are either completed or construction is ongoing. Although the record is not clear, it appears that one or more other projects may also have been started or completed prior to the reprioritization. All of those projects have been funded with EFCFA capital funds.
The Board seeks to compel the development agency and the EDA to fund and complete all of its remaining projects immediately. *871 It points in particular to three projects. The first is the George Washington Carver Institute of Science and Technology (Carver), an elementary school. In anticipation of the construction and renovation work at Carver, the elementary school students were moved to the Glenwood Campus (Glenwood), the second project, which was subsequently to be renovated for use as a middle school.
After some work began at Carver, a mold problem stemming from water infiltration was discovered. The continuing mold problem prevents reoccupation of the school until significant additional work is performed to remediate the mold problem. Because such remediation has not yet begun, Carver remains unoccupied. Although construction work at Glenwood has been completed, the Carver students must remain there until Carver's mold problem is remediated. Consequently, Glenwood is not yet available for use as a middle school. For that reason, middle school students must continue to use the Hart Complex, the third project, which is scheduled to be demolished and replaced.
The Board submitted, and in December 2007 the Commissioner approved, its 2005-2010 LRFP, which includes the projects at issue. The completion of those projects is, of course, subject to the availability of funds, through further bond issues or some other funding source. On July 9, 2008, N.J.S.A. 18A:7G-14(a) was amended to permit the EDA to issue contract bonds to raise an additional $2.9 billion for the funding of projects in SDA districts. L. 2008, c. 39, § 4. See Abbott v. Burke, 196 N.J. 451, 452-53, 956 A.2d 923 (2008) (Abbott XVIII).

II
The Board seeks an order compelling the development authority to fund and complete the projects approved by the Commissioner as part of its initial LRFP, despite the decision of the SCC, made by formal resolutions in July 2005 and April 2007, to defer all but two of those projects due to a shortage of available funding. The Board does not, however, seek to compel an additional bond issue or the expenditure of funds from the General State Fund to fund those projects, instead it seeks an order compelling the SDA to reallocate its priorities so that the Board's projects have first call on the currently available capital funds.[3]
In essence, the Board seeks review of the SCC's July 2005 adoption of the reprioritization list, as modified by the April 2007 adoption of the capital deferral plan. Rather than appealing either of the SCC's decisions, which were final agency actions appealable under Rule 2:2-3(a)(2), the Board commenced an action in lieu of prerogative writs, arguing that the SCC was equitably estopped from reallocating its funding priorities because the Board had acted to its detriment in reliance on (1) the Commissioner's approval of its initial LRFP and (2) the SCC's approval of certain actions taken in anticipation of the proposed construction. The Board also contends that it is entitled to relief under the doctrine of promissory estoppel.

A. Venue

Because actions in lieu of prerogative writs against State agencies are venued in the Appellate Division pursuant to Rule 2:2-3(a)(2) and Rule 4:69-1, the Law Division *872 appropriately transferred the case to us. Mutschler v. N.J. Dep't of Envtl. Prot., 337 N.J.Super. 1, 9-10, 766 A.2d 285 (App.Div.), certif. denied, 168 N.J. 292, 773 A.2d 1156 (2001). See also Infinity Broad. Corp. v. N.J. Meadowlands Comm'n, 187 N.J. 212, 223-24, 901 A.2d 312 (2006); Central R.R. Co. v. Neeld, 26 N.J. 172, 184-85, 139 A.2d 110 (1958).

B. Standard of Review

Our role in reviewing the decisions of an administrative agency is limited. In re Taylor, 158 N.J. 644, 656, 731 A.2d 35 (1999); Brady v. Bd. of Review, 152 N.J. 197, 210, 704 A.2d 547 (1997). We will not upset the determination of an administrative agency absent a showing that it was arbitrary, capricious, or unreasonable; that it lacked fair support in the evidence; or that it violated legislative policies. In re Musick, 143 N.J. 206, 216, 670 A.2d 11 (1996); Henry v. Rahway State Prison, 81 N.J. 571, 579-80, 410 A.2d 686 (1980); Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963). Further, decisions of administrative agencies carry with them a presumption of reasonableness. City of Newark v. Natural Res. Council, 82 N.J. 530, 539, 414 A.2d 1304, cert. denied, 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980). We may not vacate an agency's determination because of doubts as to its wisdom or because the record may support more than one result. De Vitis v. New Jersey Racing Comm'n, 202 N.J.Super. 484, 489-90, 495 A.2d 457 (App. Div.), certif. denied, 102 N.J. 337, 508 A.2d 213 (1985).
Deference to the decisions of an administrative agency is "especially appropriate when new and innovative legislation is being put into practice." In re Protest of Coastal Permit Program Rules, 354 N.J.Super. 293, 330, 807 A.2d 198 (App. Div.2002) (citing Newark Firemen's Mut. Benevolent Ass'n, Local No. 4 v. City of Newark, 90 N.J. 44, 55, 447 A.2d 130 (1982)). That is because "our courts ordinarily recognize that an agency's specialized expertise renders it particularly well-equipped to understand the issues and enact the appropriate regulations pertaining to the technical matters within its area." Ibid. (citing New Jersey State League of Municipalities v. Dep't of Cmty. Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999)).
The decisions at issue here, the allocation of scarce public funds for school renovation and construction, are highly discretionary and require the exercise of educational expertise. We start with the fact that the EFCFA provided only limited funding, N.J.S.A. 18A:7G-14, for an almost endless range of school construction projects. It then established a fairly complex procedure for the allocation of those limited resources among the many school districts in need of funds for renovations or new buildings; first, through a long range planning stage within each district, N.J.S.A. 18A:7G-4, and then through the approval of specific projects on a district-by-district basis. N.J.S.A. 18A:7G-5. Each stage of the process involved discretionary decision-making by the Commissioner, usually in consultation with the development authority. In all of its forms, N.J.S.A. 18A:7G-5(m) has accorded broad discretion to the Commissioner in establishing "a priority ranking" of school construction projects. The Commissioner is a member of the board of the SDA and was a member of the board of the SCC. The Commissioner was instrumental in preparing the prioritizations of projects by the SCC in 2005 and 2007 being challenged here.
The Board has not articulated any argument supporting the notion that its specific need for the projects that have *873 been deferred is greater than any of those of the other Abbott districts whose projects were included on the list of fifty-nine priority projects or the capital deferral plan. Nor has the Board articulated support for a finding that the deferral decisions at issue were arbitrary, capricious, or unreasonable. Instead, the Board focuses on the conduct of the development agency and the Commissioner with respect to its particular projects.

C. Equitable Estoppel

Equitable estoppel, the primary argument advanced by the Board in support of its entitlement to relief, is a remedy rarely invoked against a government entity, although it will be applied in "appropriate circumstances unless the application would `prejudice essential governmental functions.'" Middletown Twp. Policemen's Benevolent Ass'n Local No. 124 v. Twp. of Middletown, 162 N.J. 361, 367, 744 A.2d 649 (2000) (quoting Wood v. Borough of Wildwood Crest, 319 N.J.Super. 650, 656, 726 A.2d 310 (App.Div.1999)); Sellers v. Board of Trs. of the Police & Firemen's Retirement System, 399 N.J.Super. 51, 58, 942 A.2d 870 (App.Div.2008); Hemsey v. Bd. of Trs., Police & Firemen's Ret. Sys., 393 N.J.Super. 524, 535, 925 A.2d 1 (App. Div.2007), certif. granted, 196 N.J. 85, 951 A.2d 1038 (2008). The prevention of a "manifest injustice provides an exception to the general rule." Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs, 186 N.J. 5, 20, 890 A.2d 922 (2006) (quoting Casamasino v. City of Jersey City, 158 N.J. 333, 354, 730 A.2d 287 (1999)).
We hold that equitable estoppel is not applicable as a matter of law under the circumstances of this case. Application of equitable estoppel in the context of the allocation of scarce monetary resources among the SDA districts, especially in a zero-sum context, would prejudice "essential governmental functions." See Middletown Twp. Policemen's Benevolent Ass'n, supra, 162 N.J. at 367, 744 A.2d 649. The Legislature has specifically delegated to the Commissioner and the development authority the decision-making authority to allocate the available resources among the SDA districts and, absent an exercise of that discretion in an arbitrary, capricious, or unreasonable manner, the application of equitable remedies such as equitable estoppel would interfere with the exercise of that delegated authority. See O'Malley v. Dep't of Energy, 109 N.J. 309, 316-18, 537 A.2d 647 (1987) (refusing to apply equitable estoppel in the face of a paramount legislative goal).
Even if we were to consider equitable estoppel under these circumstances, we would reject its application in this case. The Board contends that the development authority is equitably estopped from deferring its projects because it reasonably relied in good faith on the Commissioner's approval of its LRFP and because it sustained a substantial injury as a result of the SCC's action in deferring those projects. The facts and the law do not support that contention.
As the Supreme Court held in Knorr v. Smeal, 178 N.J. 169, 178, 836 A.2d 794 (2003) (citing Miller v. Miller, 97 N.J. 154, 163, 478 A.2d 351 (1984)), "to establish equitable estoppel, plaintiffs must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment."
At oral argument before us, the Board pointed to the Commissioner's March 9, 2001, letter approving the LRFP as providing the basis for its overall claim. That letter quite clearly stated that "the costs indicated in this Final Determination are estimated costs of eligible projects to be *874 used by the [Department of Education] for state capital planning purposes and are not intended to represent the preliminary eligible costs or final eligible costs of approved school facilities projects" and noted that the determination of those costs would be "made at the time of approval of a particular school facilities project pursuant to N.J.S.A. 18A:7G-5." (Emphasis added).
The Board has merely articulated a general expectation that all of the projects in its LRFP would be funded and constructed. It has not demonstrated that there was ever a representation from the Commissioner or the development authority that all of those projects would be constructed at State expense, that there would be sufficient capital funding available for all of them, or that the projects would be completed within a particular time frame. Indeed, there is nothing in the record to suggest that the Board's expectations were different from those of any other school board. The EFCFA clearly provides only limited funds and a prioritization process for their expenditure, thereby putting the school districts on notice that not every proposed project can be funded and built, and certainly not within a given time frame. With respect to time frame, we note that N.J.S.A. 18A:7G-4(a) calls for revision of the LRFP every five years, which clearly bespeaks expectation of an extended time frame.
The Board makes it clear that its reliance is based on the LRFP. No specific project approvals are even mentioned. The Board has not included in its appendix any approvals of specific projects by the Commissioner, N.J.S.A. 18A:7G-5(j), or any contracts between itself and the development authority for specific projects. N.J.S.A. 18A:7G-13(c). Both of those documents are statutorily required. Consequently, the Board has not provided a factual basis to demonstrate reasonable reliance on a commitment that all or some of its projects would be funded and constructed during a specific time frame. In addition, the challenged actions by the SCC did not, as the Board suggests, revoke or cancel the approval of any eligible projects, they merely deferred their construction because of the critical shortage of capital funding.
The only specific act of reliance demonstrated by the Board concerns the move of students from the Carver building to Glenwood. It appears that, in August 2004, the SCC approved the Board's proposal to move the students from Carver to Glenwood to facilitate the renovation of the Carver auditorium and the replacement of the main building. However, it was not merely the reordering of project priorities that prevented the return of those students to the Carver facility, but the discovery of a significant mold problem and the corresponding expenses necessary to remedy it. Those previously unplanned and unbudgeted renovations include, according to the stipulated facts, "a new roof, repair/replacement of numerous exterior walls, repair/replacement of numerous water damaged areas of interior walls and ceilings, and removal of the mold." Although the students were initially moved to facilitate building at the Carver facility, they would undoubtedly have been moved in any event, once the mold problem was discovered.
While unfortunate, the Carver problem is not the basis for application of equitable estoppel, especially inasmuch as the SCC was in no way responsible for the mold problem. In addition, the Board concedes that the Carver project was only in the design stage at the time the students were moved.

D. Promissory Estoppel

The Board also argues that it should prevail under the doctrine of promissory *875 estoppel, relying on Lobiondo v. O'Callaghan, 357 N.J.Super. 488, 499, 815 A.2d 1013 (App.Div.), certif. denied, 177 N.J. 224, 827 A.2d 291 (2003). The elements of promissory estoppel are "1) a clear and definite promise, 2) made with the expectation that the promisee will rely upon it, 3) reasonable reliance upon the promise, 4) which results in definite and substantial detriment." Ibid. (citing Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank, 163 N.J.Super. 463, 479, 395 A.2d 222 (App.Div.1978)). For the reasons explained with respect to equitable estoppel, the Board has not made out even a prima facie case for promissory estoppel, particularly with respect to the first three factors.

III
In summary, we hold that the Board's action was properly transferred from the Law Division to the Appellate Division. We also hold that the Board is not entitled to relief on the basis of either equitable or promissory estoppel. There is no basis in the record to conclude that the action of the SCC, or its successor the SDA, was arbitrary, capricious, or unreasonable. Consequently, the order of transfer is affirmed and the action in lieu of prerogative writs is dismissed with prejudice.
Affirmed and the complaint is dismissed with prejudice.
NOTES
[1] See also Lonegan v. State, 176 N.J. 2, 819 A.2d 395 (2003).
[2] As originally enacted, the EFCFA referred to Abbott districts. The EFCFA was amended in 2007 to cover SDA districts, which are defined by N.J.S.A. 18A:7G-3 as "a district that received educational opportunity aid or preschool expansion aid in the 2007-2008 school year."
[3] This point was clarified at oral argument before us. At that time, the Board also conceded that there are other interested entities, i.e., school districts that would lose funding for their projects under a reallocation of priorities, which are not parties to this action. See R. 4:28-1.