1 A.3d 843 (2010)
415 N.J. Super. 335
Michael B. FRANCOIS, Petitioner-Appellant,
v.
BOARD OF TRUSTEES, Public Employees' Retirement System, Defendant-Respondent.
Docket No. A-0687-08T2
Superior Court of New Jersey, Appellate Division.
Argued November 5, 2009.
Decided August 23, 2010.
*844 Samuel J. Halpern, West Orange, argued the cause for appellant.
*845 Kellie L. Pushko, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Melissa Raksa, Assistant Attorney General, of counsel; Eileen S. Den Bleyker, Senior Deputy Attorney General, on the brief).
Before Judges STERN, GRAVES and J.N. HARRIS.
The opinion of the court was delivered by
STERN, P.J.A.D.
This is an appeal from a final administrative determination of the Board of Trustees (Board) of the Public Employees' Retirement System (PERS) denying petitioner Michael B. Francois service credit in PERS as an employee of the New Jersey Economic Development Authority (EDA) for the period from May 2003 to December 2005. During that period Francois served on "mobility assignment" as Director of the Real Estate Department of the Port Authority of New York and New Jersey (Port Authority). The Board adopted the initial decision of an Administrative Law Judge (ALJ), and denied the petition.[1] We reverse the final administrative determination, and remand for further proceedings.
Petitioner was loaned by the petitioner's employer to another government agency for reasons that presumably benefited the State of New Jersey; the agency informed the employee that his pension would not be impaired during the period of assignment, and the employer continued to pay his salary during that period. Petitioner cannot be penalized by being denied credit for the salary which he would have earned at the EDA if he had not accepted the mobility assignment. However, the differential in salary based on the higher amount petitioner earned at the Port Authority should not be creditable.

I.
Petitioner was born on March 20, 1950. He worked for the City of Plainfield, New Jersey, from February 26, 1975 to May 30, 1981, but apparently did not enter into PERS during that period. Petitioner became an employee of the EDA on June 8, 1981, and was then enrolled in PERS. During his tenure at the EDA, petitioner served as Assistant Director, then Director, and finally Managing Director of Real Estate.
In April 2003, Anthony R. Coscia, who had been chairman of the EDA since February 1992, was appointed chair of the Port Authority. Shortly after this appointment, Chairman Coscia told petitioner that the position of Director of Real Estate at the Port Authority was available, and because of petitioner's interest, suggested that petitioner "send him a bio or resume."
Petitioner was interviewed for the position by the Port Authority's Executive Director, Joseph J. Seymour, and other senior Port Authority staff. Petitioner testified that subsequently Chairman Coscia told petitioner that the Port Authority staff "felt the most appropriate way" for petitioner to "become involved or go to the Port Authority, would be a [m]obility [a]ssignment," and that such a mobility assignment would provide him with "the most flexibility." Petitioner testified that Chairman Coscia said that such an assignment "would probably be the best way to approach" the issue given the "potential changing function and responsibilities of the Real Estate Director at the Port Authority."
*846 Petitioner testified that he was not "thinking about retiring" at the time. However, a few months previously he requested a quote from PERS for the amount it would cost to buy back his years of service at the City of Plainfield which he had not yet purchased. On January 10, 2003 petitioner was informed by the Purchase Section of PERS that the lump sum cost for purchasing his outstanding non-purchased months of service would be $44,802.75, or alternatively he could buy back the time with 120 monthly payments of $553.52 for a total of $66,422.40. On March 19, 2003 petitioner, who had previously bought back twelve months of credit, bought back the balance of his possible credit for his service for the City of Plainfield, which totaled sixty-three months.
The Port Authority, which had experience with mobility agreements, provided a draft agreement to Caren S. Franzini, Executive Director of the EDA. This draft agreement, which apparently was intended to be used by a New York State employee entering a mobility assignment at the Port Authority, contained a paragraph which provided that
[i]t is the Port Authority's intention that, subject to the provisions of New York's Retirement and Social Security Law, you may continue to accrue service credit with the New York State and Local Employees Retirement System (the System) for retirement purposes during the term of the assignment . . . [T]he Port Authority will take such action as may be necessary so that your benefits shall be equivalent to those to which you would have been entitled had you not accepted this assignment. In any event, the period of this assignment will be credited as Port Authority service.
On May 13, 2003 EDA Executive Director Franzini sent a Memorandum of Understanding (MOU) to petitioner which set forth the terms of the agreement which the EDA was shortly to enter into with the Port Authority regarding petitioner's mobility assignment. Franzini wrote that the mobility assignment was "designed to further mutually beneficial outreach programs which promote stable and productive relations with other regional entities and enhance mutual business objectives while providing you with an opportunity to further your development and career goals." The memo further stated that during the term of the mobility assignment
you will remain an EDA employee; except as outlined herein, you will continue to be subject to the rules and regulations governing all EDA employees, including the Code of Ethics and Financial Disclosure and the policies and procedures then in effect which apply to permanent professional and managerial EDA employees. Furthermore, your service with the Port Authority is to be subject to the applicable ethical standards of the Port Authority. During the term of this assignment and thereafter, you shall not provide to either the EDA or the Port Authority any confidential information relating to the other. During the term of this assignment, you may deal with substantive matters affecting the EDA or the Port Authority dealings with the EDA or otherwise affecting the EDA.
You are to report for work to offices assigned to you by the Port Authority and your work, performance, and attendance will be subject to supervision by the Port Authority. You will continue to report to the EDA at least one day a week, unless otherwise agreed to by the EDA director.
According to the MOU, petitioner's salary was to be $155,000, to be "funded by the Port Authority," but was to be "paid" to petitioner by the EDA. The term of the *847 "assignment" was to be a maximum of a year, and "upon completion of this assignment" and "return to" petitioner's "EDA assignment," petitioner's salary was to decrease to $124,800, "as adjusted to reflect any merit increases" he "would have received during the term."
The MOU also contained provisions regarding "benefits coverage," "vehicle assignment," "time off" and "travel and incidental expenses." As to "service credit," the MOU specifically stated petitioner's pension status:

It is the EDA's intention that, subject to the provisions of New Jersey Law, you may continue to accrue service credit with the New Jersey State Pension System (the "System") for retirement purposes during the term of this assignment. Should need arise at retirement or otherwise, a calculation will be made to determine whether or not your pension rights as of the date thereof have been reduced as a result of this assignment, based on a formal determination obtained from the System. If so, the EDA will take such action as may be necessary so that your benefits shall be the equivalent to those to which you would have been entitled had you not accepted this assignment. In any event, the period of this assignment will be credited as EDA service.

[(Emphasis added).]
On May 14, 2003 Port Authority Executive Director Seymour sent a letter to Franzini "confirm[ing] discussions in reference" to the "temporary assignment" of petitioner to serve as Director of the Port Authority Real Estate Department. Petitioner's mobility assignment was to begin on May 25, 2003 and was to last up to one year, though the assignment could be terminated "at any time on 15 days' notice" by the Port Authority, the EDA, or by petitioner. The Seymour letter further stated that it had been agreed that "the Port Authority will reimburse the EDA for the cost of salary and benefits . . . during this period, payable on invoices to be submitted by the EDA." The Port Authority agreed not to request that petitioner act "contrary to applicable provisions of the Port Authority's Code of Ethics and Financial Disclosure" and also agreed that petitioner's service would additionally be governed by the New Jersey Conflicts of Interest Law, N.J.S.A. 52:13D-12 to 52:13D-28. Petitioner was also "expected to keep the EDA Executive Director advised of his activities and his progress during the course of his assignment, no less than every thirty days." Port Authority Executive Director Seymour explained that
The Port Authority and the EDA consider this assignment an opportunity for Mr. Francois to assist both agencies. In addition, the assignment will strengthen the relationship between Port Authority and EDA; develop professional and personal contacts which will serve both agencies well in the future; improve understanding and communications between the Port Authority and EDA; and enhance the goals of strengthening the region's economy.
The EDA had entered into a mobility assignment in the past with a private sector entity. In another instance the EDA and the New Jersey Department of Treasury entered into an agreement to share an employee. However, the mobility agreement between the EDA and the Port Authority regarding petitioner was the first which the EDA entered with a non-State of New Jersey agency.
During petitioner's time on the mobility assignment as the Director of Real Estate for the Port Authority he was responsible for managing and coordinating assorted real estate and leasing activities. Petitioner *848 "engaged in very difficult negotiations" regarding the redevelopment of the World Trade Center. He also worked on the "Portfields Initiative," that redeveloped Brownfield sites within urban centers, in addition to other projects that directly benefited New Jersey.
Petitioner received his paycheck from the EDA during the mobility assignment. Throughout 2003 and early 2004 petitioner reported he was "working out of two offices," the EDA's office in Trenton "one or two days a week" and the remainder of the time at the Port Authority's office in Manhattan. Petitioner testified that by early 2004 it "became just to[o] overwhelming for me to be reporting at two locations," after which petitioner only reported to the Port Authority office.
On February 23, 2004 petitioner, the EDA, and the Port Authority entered into a new MOU regarding petitioner's mobility assignment, which superseded the May 13, 2003 MOU and extended the mobility assignment to May 31, 2006.
The February 2004 MOU was written in the form of a memorandum to petitioner as "Managing Director, Real Estate" from Greg Ritz, Chief Financial Officer and Controller of the EDA, and was executed by the controller, Seymour and petitioner. It was an extension of the previous agreement, except that it provided that petitioner would only report to the Port Authority office, and that petitioner's "work, performance, and attendance" would be supervised by the Port Authority. Like the previous MOU, the February 2004 MOU provided that during the mobility assignment the petitioner would remain an employee of the EDA, but that the petitioner would abide with the "rules and regulations governing all EDA employees" and the "applicable ethical standards of the Port Authority." Significantly, the February 2004 MOU stated that:
It is the EDA's intention that, subject to the provisions of New Jersey Law, you may continue to accrue service credit with the New Jersey State Pension System. . . for retirement purposes during the term of this assignment. The period of this assignment will be credited as EDA service.
It is clear that, irrespective of other benefits petitioner may have been receiving by the assignment at the Port Authority, at age fifty-three and after approximately twenty-seven years of creditable service (including the "buy back" purchases) he did not want to jeopardize or sacrifice his pension benefits.
In January 2003, before petitioner began the mobility assignment, his salary at the EDA was $124,800. In May 2003, at the start of the mobility assignment, petitioner's salary was raised to $155,000. On February 20, 2004 petitioner's salary was raised to $159,666 effective February 2004. On April 1, 2004 his salary was raised to $168,610 effective immediately, and to $170,014 effective July 2004. Finally, petitioner's salary was raised to $175,100 effective January 1, 2005.
Petitioner turned fifty-five on March 20, 2005. On November 30, 2005, Kenneth J. Ringler, Jr., who had assumed the post of Executive Director of the Port Authority, offered petitioner the position of Chief of Real Estate and Development. The offer letter stated that petitioner's "duties and responsibilities for the Port Authority" would not be affected. On December 5, 2005, petitioner informed the EDA that he intended to "resign" and "retire" from that agency effective January 1, 2006, that his "last day as a NJEDA employee" would be Friday, December 9, 2005, and that he was going to join the Port Authority. Having reached age fifty-five, petitioner was then entitled to retire based on his age and twenty-five years of service. He was eligible *849 for an "early retirement" without penalty for retiring before age fifty-five. See N.J.S.A. 43:15A-41(b).
Petitioner filed his application for early retirement with PERS on December 22, 2005 with an effective date of January 1, 2006. The EDA certified that petitioner's final salary was $175,112. Based on this information, the Department of Treasury, Division of Pensions and Benefits (Division of Pensions), produced an "estimate of retirement benefits" based on thirty years, ten months of service and a final average salary of $162,283.
Subsequently, the Division of Pensions conducted an automatic review of petitioner's retirement application as petitioner had received salary increases of over ten percent during his last five years of service. On February 3, 2006 the Division of Pensions informed the EDA that the Division did not consider the salary petitioner earned on mobility assignment to be creditable compensation, because it was compensation "for extra work, duty or service beyond the . . . normal duty assignment." N.J.A.C. 17:2-4.1(a)(2). The Division of Pensions noted that petitioner's salary had "increased over 40 percent from May 2003 to January 2005" and that petitioner had surpassed the range of his salary grade.
On March 20, 2006, petitioner requested that the PERS Board review the determination that the salary he had earned on mobility assignment would not be creditable. During its meeting on July 19, 2006, the Board considered petitioner's appeal, and requested more information before reaching a decision. At its September 26, 2006 meeting, the Board again reviewed petitioner's case, noted that petitioner was currently employed with the Port Authority, and "found that regardless of the letter agreements setting forth the terms and conditions of Mr. Francois' employment between the EDA and the Port Authority, Mr. Francois was not in PERS-covered service during his employment with the Port Authority." The Board therefore concluded that petitioner's "service and salary with the Port Authority from May 1, 2003 through his retirement date [January 1, 2006]" was not "creditable," and that the retirement allowance would be adjusted for that period, including an "offset for the return of pension contributions."
Petitioner's subsequent appeal of the Board determination was treated as a "contested case." At the plenary hearing before an ALJ, petitioner stated that he was actually eligible for early retirement in March 2003 before taking the mobility assignment. He explained that though he began working for the EDA in 1981, he purchased sufficient credit for the earlier years in which he worked for the City of Plainfield in order to have twenty-five years of credit in PERS and thus qualify for early retirement in March 2003. However, if petitioner had taken early retirement at that time, instead of accepting the mobility assignment, his retirement benefits would have been reduced one-quarter of one percent for each month on which petitioner was under the age of fifty-five. Since petitioner was born in March 1950, if he had retired in March 2003 his retirement benefits would have been reduced by six percent. N.J.S.A. 43:15A-41(b)(a).
Petitioner did not ask the Division of Pensions how the mobility assignment would affect his pension benefits before he began the mobility assignment. Petitioner testified that no one suggested that he should consult with the Division of Pensions. Nor did he think it was necessary for him to consult with the Division because he was "under the impression that. . . all the benefits were going to be in place, they were to going to remain and the pension was part of that." The MOU so stated, and he was receiving his pay and *850 benefits from the EDA. Petitioner also testified that he had no discussion with EDA Executive Director Franzini about his pension status. However, petitioner "wanted to make sure that all [his] benefits," including pension and health benefits, "remain[ed]" in place, and Ritz assured him that "my benefit package from the EDA was intact when I was on [m]obility [a]ssignment."
Franzini testified that she had no "conversations with pension or human resources people" regarding potential salary issues concerning the mobility assignment. Petitioner also emphasized that the "EDA had discussions with the Port Authority, and felt this arrangement would be mutually beneficial to all parties," and they came to him with the MOU. In other words, he did not engineer the assignments or benefits.
Louis J. LaCapra, Chief Administrative Officer of the Port Authority, who was responsible for Human Resources, testified that accepting petitioner on a mobility assignment was attractive to the Port Authority because it had been difficult to fill the open Director of Real Estate position at the very time they were "negotiating for the rebuilding of the World Trade Center." LaCapra stressed that petitioner "was not a Port Authority employee" during the mobility assignment and did not pay into the New York pension system.
On July 22, 2008 the ALJ rendered his initial decision. He found that
The Port Authority was indirectly paying petitioner and he worked day-to-day in its organizational structure. He held himself out as that [a]gency's Chief of Real Estate & Development and ethical limitations prevented him from working on EDA matters during the operative period[]. Thus, he was in all respects doing the business of the Port Authority and the agreements created to express a different intent cannot overcome these facts. . . . Moreover, [the Director of the Division of Pensions, Frederick Beaver, and the Chief of that Division's Health Benefits Bureau, David J. Pointer, who both testified], both experienced in pension matters, were unfamiliar with the mobility assignment concept and Ms. Franzini did not submit the relevant documents for legal review. The novelty of the arrangement ought in prudence to have impelled an inquiry to the Division [of Pensions] and in failing to do so petitioner assumed the risk that skeptical regulators would disallow it.
The ALJ further stated that "it is possible as petitioner suggests that the mobility assignment was an innocent mechan[ism] sought by the Port Authority to evaluate him for [a] permanent appointment."[2] The ALJ noted that "[p]etitioner's request for a retirement quote in early 2003 reflects that retirement was on his mind . . . the mobility assignment well suited petitioner's circumstances."
In conclusion, the ALJ ordered "that service credit be denied between May 2003 and December 2005 and that petitioner's pension be adjusted accordingly."
Petitioner filed exceptions to this decision, and the PERS Board issued its final administrative decision on August 21, 2008, as corrected on October 6, 2008. As noted above, the Board adopted the ALJ's findings of fact and conclusions of law, which were consistent with the PERS Board's original determination that petitioner should be denied "service credit" for the *851 period between May 2003 to December 2005.

II.
"[J]udicial review of an administrative agency action is limited" because respect is due to the "`expertise and superior knowledge'" of an agency in its specialized field. Hemsey v. Bd. of Trs., Police & Firemen's Ret. Sys., 198 N.J. 215, 223, 966 A.2d 1020 (2009) (quoting In re License Issued to Zahl, 186 N.J. 341, 353, 895 A.2d 437 (2006)). An appellate court should generally defer to the interpretations of a state agency of the statutes and implementing regulations it administers, unless the interpretation is "plainly unreasonable." In Re Election Law Enforcement Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 260, 989 A.2d 1254 (2010) (citation and internal quotation marks omitted). "Without a `clear showing' that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record, an administrative agency's final quasi-judicial decision should be sustained, regardless of whether a reviewing court would have reached a different conclusion in the first instance." Circus Liquors, Inc. v. Middletown Twp., 199 N.J. 1, 9, 970 A.2d 347 (2009).
However, an appellate court is not bound by an agency's determination of a purely legal issue. Utley v. Bd. of Review, Dep't of Labor, 194 N.J. 534, 551, 946 A.2d 1039 (2008); see Krayniak v. Bd. of Trs., Pub. Employees' Ret. Sys., 412 N.J.Super. 232, 237, 989 A.2d 306 (App.Div.2010).
Petitioner argues that the PERS Board's determination that petitioner was not an employee of the EDA during the course of the mobility assignment and the consequent rejection of his "service accrued while on mobility assignment with the Port Authority as well as all salaries earned was arbitrary, capricious, unreasonable, and illegal." The Board responds that its "findings that Francois did not perform service creditable in PERS while he worked on assignment for the Port Authority . . . is amply supported by the record and correctly applies governing law." The Board further contends that the record adequately supports its finding that petitioner was not an "employee" of EDA after May 2003.
Employees of the State (not members of other pensions) become members of PERS. N.J.S.A. 43:15A-7(b). A pensioner is credited with the period he or she receives "compensation" while enrolled in PERS. See N.J.S.A. 43:15A-25. For the purpose of PERS, "compensation" is defined[3] as:
the base or contractual salary, for services as an employee, which is in accordance with established salary policies of the member's employer for all employees in the same position but shall not include individual salary adjustments which are granted primarily in anticipation of the member's retirement or additional remuneration for performing temporary or extracurricular duties beyond the regular workday or the regular work year.
[(N.J.S.A. 43:15A-6(r)(1)).]
An important goal of pensions for public employees "is to induce able persons to enter and remain in public employment, and to render faithful and efficient service while so employed." Geller v. N.J. Dep't of Treasury, Div. of Pensions & Annuity Fund, 53 N.J. 591, 597, 252 A.2d 393 (1969). Public employee pensions are both "compensation for services previously *852 rendered" and "an inducement to continued and faithful service." Ibid.
As a form of legislation aimed at remedying a social problem, pension statutes "`should be liberally construed and administered in favor of the persons intended to be benefited.'" Klumb v. Bd. of Educ. of Manalapan-Englishtown Reg'l High Sch.Dist., 199 N.J. 14, 34, 970 A.2d 354 (2009) (quoting Geller, supra, 53 N.J. at 597-598, 252 A.2d 393). Such a liberal construction "resolves all reasonable doubts in favor of the applicability of the statute to the particular case." Kochen v. Consol. Police & Firemen's Pension Fund Comm'n, 71 N.J.Super. 463, 478, 177 A.2d 304 (App.Div.1962). See Duignan v. Bd. of Trs., Pub. Employees' Ret. Sys., 223 N.J.Super. 208, 216, 538 A.2d 432 (App. Div.1988) (same); Hillman v. Bd. Trs., Pub. Employees' Ret. Sys., 109 N.J.Super. 449, 455, 263 A.2d 789 (App.Div.1970) (same).
However, "[i]n spite of liberal construction, an employee has only such rights and benefits as are based upon and within the scope of the provisions of the statute." Casale v. Pension Com. of the Employees' Ret. Sys. of Newark, 78 N.J.Super. 38, 40, 187 A.2d 372 (Law Div. 1963). "[A] potential adverse impact on the financial integrity" of the pension fund and the ordinary meaning of the words of a statute may counsel against too broad an application of a pension statute in favor of a petitioner. Chaleff v. Teachers' Pension & Annuity Fund Trs., 188 N.J.Super. 194, 197, 457 A.2d 33 (App.Div.), certif. denied, 94 N.J. 573, 468 A.2d 215 (1983). Thus, "pensions statutes are [also] to be construed so as to preserve the fiscal integrity of the pension funds." DiMaria v. Bd. of Trs. of Pub. Employees' Ret. Sys., 225 N.J.Super. 341, 354, 542 A.2d 498 (App. Div.), certif. denied, 113 N.J. 638, 552 A.2d 164 (1988) (converting public position from "part time" to "full time" did not change nature of job sufficiently to designate it a new position not bound by the requirements of N.J.S.A. 43:15A-6(r)). See also Fair Lawn Educ. Assoc. v. Fair Lawn Bd. of Educ., 79 N.J. 574, 582, 401 A.2d 681 (1979) ("actions taken by a state agency which may substantially affect retirement age and thus the actuarial assumptions of a statutory pension system are impermissible unless clearly and unequivocally authorized by the Legislature."). Moreover, while a person "eligible for benefits" is entitled to a liberal interpretation of the pension statute, "`eligibility [itself] is not to be liberally permitted.'" Krayniak, supra, 412 N.J.Super. at 242, 989 A.2d 306 (quoting Smith v. State, Dep't of Treasury, Div. of Pensions & Benefits, 390 N.J.Super. 209, 213, 915 A.2d 48 (App.Div.2007)). An inappropriate allowance of benefits tends "to place a greater strain on the financial integrity of the fund in question and its future availability for those persons who are truly eligible for such benefits." Smith, supra, 390 N.J.Super. at 215, 915 A.2d 48.
The Port Authority has elected to be part of the New York State pension system rather than New Jersey's PERS "as a matter of convenience." Bunk v. Port Auth. of N.Y. & N.J., 144 N.J. 176, 189, 676 A.2d 118 (1996).[4] As only employees of entities that have joined PERS can earn PERS credit, if petitioner was an employee of the Port Authority, rather than the EDA, during his mobility assignment his service and salary during that period would not be creditable in PERS. See Stevens *853 v. Bd. of Trs. of Pub. Employees' Ret. Sys., 294 N.J.Super. 643, 684 A.2d 104 (App.Div.1996) (Stevens I), appeal on remand, 309 N.J.Super. 300, 303, 706 A.2d 1191 (App.Div.1998) (Stevens II).
In their briefs the parties propose alternative tests to determine whether petitioner was an employee of the EDA or the Port Authority. We have previously approved of the PERS Board's use in individual contested cases of the following twenty factors, which was originally set forth by the Internal Revenue Service in Rev. Rul. 87-41, 1987-1 C.B. 296, 298-99, to determine whether a public sector employer had sufficient "control" over a person to so that the person was an employee whose service and salary was creditable in PERS:
The "control" factors include: (1) instructions; (2) training; (3) integration; (4) services rendered personally; (5) hiring, supervising, and paying assistants; (6) continuing relationship; (7) set hours of work; (8) full time required; (9) doing work on employer's premises; (10) order or sequence set; (11) oral or written reports; (12) payment by hour, week, month; (13) payment of business and/or traveling expenses; (14) furnishing of tools and materials; (15) significant investment; (16) realization of profit or loss; (17) working for more than one firm at a time; (18) making service available to general public; (19) right to discharge; (20) right to terminate.
[Stevens I, supra, 294 N.J.Super. at 653 n. 1, 684 A.2d 104 (recounting control test used by the PERS Board), approved on remand, Stevens II, supra, 309 N.J.Super. at 304, 706 A.2d 1191 (endorsing use of control test in a contested case and noting it allows for "extensive examination of the relationship between" petitioner and public employer).].
See also Hemsey v. Bd. of Trs., Police & Firemen's Ret. Sys., 393 N.J.Super. 524, 542, 925 A.2d 1 (App.Div.2007), overruled in part on other grounds, 198 N.J. 215, 966 A.2d 1020 (2009) (approving pension board's use of twenty-factor test in contested case without promulgating a regulation). However, the control test was not applied by the Board in this case, undoubtedly because the test, which was designed to determine whether a person was an independent contractor or an employee, see Hemsey, supra, 393 N.J.Super. at 542, 925 A.2d 1, Stevens II, supra, 309 N.J.Super. at 303-04, 706 A.2d 1191, would not be helpful or relevant to the peculiar facts and issue involved.
In any event, we have previously said that "[f]or purposes of the definition of compensation embodied in N.J.S.A. 43:15A-6(r) . . . the employer was that public unit which carried petitioner on its direct payroll." Rokos v. N.J. Dep't of Treasury, Div. of Pensions, Pub. Employees' Ret. Sys., 236 N.J.Super. 174, 182, 564 A.2d 1217 (App.Div.1989) (municipal court judge was the employee of the local municipality which directly paid him, rather than the State of New Jersey, which through the Assignment Judge appointed him presiding judge of municipal courts in Union County under Supreme Court pilot program).[5] This rule that employment is determined by the "direct and immediate payroll source," id. at 182, 564 A.2d 1217, as opposed to the appointment authority or ultimate source of the funds for a program or position, is supported by public policy in *854 the context of mobility assignments because it is easily applied and gives clear notice to employees and government units. Such clarity is of paramount importance in the public pension field.
Petitioner contends that he relied on assurances that his pension would not be adversely affected by the assignment and that PERS should be estopped from denying him pension benefits. However, petitioner had no communications with PERS, and he relied on nothing he was told by PERS. Compare Steinmann v. State, Dep't Treasury, Div. of Pensions, Teachers' Pension & Annuity Fund, 116 N.J. 564, 566-69, 576, 562 A.2d 791 (1989) (good cause existed for petitioner to change her pension designation when pension board failed to provide her relevant information in a booklet it referred to her) with Hemsey, supra, 393 N.J.Super. at 543, 925 A.2d 1 (no valid equitable estoppel claim when there was no evidence that petitioner "consulted with the Division of Pensions" before entering into contract with a municipality). Moreover, neither the EDA nor any other State agency can bind PERS regarding its authority or the pension laws.[6] On the other hand, remaining on the EDA payroll for several years while working for another government agency when he would not otherwise be eligible for a full pension, could be a fraud on the pension system, particularly if his salary is increased at the end of his service.
Yet, here there was no finding of fraud or of a scheme developed for pension purposes, and there can be no doubt New Jersey had a great interest after the September 11th attacks in working with its Port Authority in redeveloping the World Trade Center and promoting real estate development throughout the region. The times permitted some fluidity, including in the use of personnel.
In Sellers v. Board of Trustees, Police & Firemen's Retirement System, 399 N.J.Super. 51, 942 A.2d 870 (App.Div. 2008), a municipality advised a firefighter that he was eligible to join the pension system, but the trustees later determined that he was not. We remanded the case so that the trustees could consider crafting a solution that took into account the equities of the situation, including whether "the government failed to `turn square corners' with him." Id. at 59, 62-63, 942 A.2d 870 (quoting F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 426, 495 A.2d 1313 (1985)). In the present case petitioner received written assurances from the EDA before taking the mobility assignment that his time on mobility assignment will "be credited as EDA service." While petitioner should have had doubts about whether his pension could include the benefits of the Port Authority's higher salaries as he closed his career, petitioner was nevertheless entitled to presume that he would not be penalized by accepting the mobility assignment while remaining on the EDA payroll and being paid by it. See Kyer v. City of E. Orange, 315 N.J.Super. 524, 534, 719 A.2d 184 (App.Div.1998) ("persons employed by civil service municipalities ought not to have to retain counsel for advice as to their job rights"); Sellers, supra, 399 N.J.Super. at 62, 942 A.2d 870 ("[p]eople accepting public employment should be able to do so without hiring lawyers to assure that they qualify for the position").
Therefore, despite our limited scope of review, we hold that in the absence of a finding of bad faith, the PERS Board *855 erred by denying petitioner service credit for his time on mobility assignment. We recognize our scope of review of the agency determination. However, the ALJ's determination, and Board's adoption of his initial decision, involved no credibility decisions or critical fact-finding. It was more akin to a legal determination based on undisputed facts, and to the extent petitioner may have been involved in creating the mobility assignment for pension purposes, the ALJ stated "[m]otive is not critical to a determination here. . . ."
The fact the agreement was drafted and extended to be applicable only until petitioner became eligible for an "early retirement" at age fifty-five without penalty may not be coincidental. In fact, it is clear the agreement was drafted to protect petitioner's pension and to provide the service credits. However, we find no statutory or other authority requiring an agency to obtain the approval of the Board or Division of Pensions before making assignments, or giving the Board or the Division the authority to monitor the work assignments of State employees. Any abuse of assignment authority may be remedied by the Governor or Attorney General, or by the voters at the polls. And, applying the same principles governing this case, we doubt that had petitioner received the very same mobility assignment for two-and-a-half years ten years earlier in his career that there would be any question about its creditability following his return to EDA. Furthermore, there is no adverse impact on the integrity of the fund because all contributions have been made with respect to petitioner's compensation.
We recognize the existence of the "Government Employee Interchange Act," N.J.S.A. 52:14-6.10 to -6.18, which authorizes the concept of interagency assignments based on certain conditions and requirements which were not followed in this case. See N.J.S.A. 52:14-6.14, -6.15. We need not decide if a bi-State agency like the Port Authority is a "State Governmental unit" for the purposes of the Act, see N.J.S.A. 52:14-6.12(g), and, therefore, if the Act applies because neither the ALJ nor the Board in their decisions cited or apparently deemed it relevant to the case. In any event, N.J.S.A. 52:14-6.11 encourages "intergovernmental co-operation" as "essential to the resolution of problems affecting this State" and requiring liberal construction of the Act "to effectuate [its] purposes and intent," the provisions of which are expressly severable in case of partial invalidity. See N.J.S.A. 52:14-6.18. See also N.J.S.A. 52:14-1 to -6, which similarly states the need for cooperation between departments and other units of State government, and N.J.S.A. 52:14-3 and 14-4, requiring notification to, not approval by, the Director of Budget and Accounting for cooperative work. Moreover, we cannot see how the failure of the EDA to comply with the Act can bind petitioner and preclude employment with the EDA.
In In re Viviani, 184 N.J.Super. 582, 590, 446 A.2d 1239 (App.Div.), certif. denied, 91 N.J. 533, 453 A.2d 854 (1982), James Ware, the Director of the Division of Unemployment and Disability Insurance (UDI) in the classified service took a leave of absence to become an Assistant Commissioner in the Department of Labor and Industry, an unclassified position, and was advised by the Department of Civil Service of his right to return to the classified service position thereafter. He subsequently was granted a paid leave of absence to serve as Regional Administrator of Employment and Training for the federal government pursuant to federal legislation and the Government Employee Interchange Act. Thereafter, over the disapproval of Civil Service of another assignment under the Act, Ware accepted another federal position by taking a leave *856 of absence without pay. He did not serve in his classified State position for over five years, but was entitled to return to his classified position as Director of UDI despite the fact another person was advised he "attained permanent status in [that] position[]," id. at 585-87, 446 A.2d 1239, and that the Government Employee Interchange Act was not complied with.
In essence, we conclude that the "mobility assignment" furthered the purpose of the compact creating the Port Authority, see N.J.S.A. 32:1-1, and that petitioner is entitled to the service credits for the time spent between May 2003 and December 2005 while assigned by the EDA to work at the Port Authority.

III.
In light of our conclusion, we must consider to what degree the salary petitioner earned on mobility assignment will be creditable. The regulation implementing N.J.S.A. 43:15A-6(r)(1) for PERS provides that:
(a) The compensation of a member subject to pension and group life insurance contributions and creditable for retirement and death benefits in the system shall be limited to base salary and shall not include extra compensation.
[(N.J.A.C. 17:2-4.1).]
"Base salary" is defined as
[T]he annual compensation of a member, plus the value of maintenance, if applicable, in accordance with contracts, ordinances, resolutions or other established salary policies of the member's employer for all employees in the same position, or all employees covered by the same collective bargaining agreement, which is paid in regular, periodic installments in accordance with the payroll cycle of the employer.
[(N.J.A.C. 17:2-1A.1).]
"Extra compensation" is defined as
[I]ndividual salary adjustments which are granted primarily in anticipation of a member's retirement; or as additional remuneration for performing temporary duties beyond the regular work day or work year.
[(Ibid.).]
The implementing regulation notes that
Forms of compensation that have been identified as extra compensation include, but are not limited to:
. . . .
9. Compensation in the absence of services;
10. Increments or adjustments in recognition of the member's forthcoming retirement;
11. Any form of compensation which is not included in the base salary of all employees in the same position or covered by the same collective bargaining agreement who are members of the retirement system and who receive the compensation[.]
[(N.J.A.C. 17:2-4.1).]
While there is no previous New Jersey case specifically discussing the implications of a mobility assignment on the credibility of salary, it is clear that limitations must be imposed upon practices which might artificially boost pension benefits or be inconsistent with the employer's payment of "compensation."
In Tubridy v. Consol. Police and Firemen's Pension Fund Comm'n, 84 N.J.Super. 257, 201 A.2d 736 (App.Div.1964), a Jersey City fire captain who had been granted a leave of absence to become fire commissioner argued that his pension benefits should properly be calculated based upon the higher salary of the later position. Id. at 258-59, 201 A.2d 736. As fire commissioner, the petitioner had played an *857 "administrative-supervisory" role in responding to fires, rather than actively fighting fires. Id. at 263, 201 A.2d 736. Judge Conford, speaking for this court, agreed with the Pension Board "that the pension statute [did] not contemplate that salary paid for services in any such office constitutes salary paid as compensation of an active member of the fire department so as to justify a pension calculated on the basis thereof." Ibid. Even though the pension fund had taken increased deductions from the petitioner's salary, it was not estopped from reducing the petitioner's pension because the petitioner had not shown that he had put "material reliance upon an assurance from anyone in authority that he would be entitled to a pension geared to the salary of fire commissioner." Id. at 264, 201 A.2d 736.
There is a general policy consideration "against dissipation of public funds through unauthorized pension grants." Skulski v. Nolan, 68 N.J. 179, 197, 343 A.2d 721 (1975). In Tubridy, we stressed that the pension statute was "carefully drawn to protect the integrity of the public and contributed funds from which pensions are paid." Tubridy, supra, 84 N.J.Super. at 263, 201 A.2d 736. The PERS Board owes a fiduciary duty to its members to protect the financial integrity of the fund. Mount v. Trustees of Pub. Employees' Ret. Sys., 133 N.J.Super. 72, 86, 335 A.2d 559 (App.Div.1975). Moreover, petitioner could hardly expect that he would be entitled to a pension based on extra salary, above his EDA compensation, earned while employed outside the State for services rendered to another entity.
While it would be wrong to penalize petitioner for accepting the mobility assignment by denying him credit for his "compensation" earned during that period, the financial integrity of PERS must also be protected, and it would be equally wrong to award him a salary he would not have earned with the EDA during the same period. As he argues he was an EDA employee and entitled to benefits as such, his creditable salary should be so limited. Accordingly, we remand to the Board for further proceedings. Petitioner should be credited for his service from May 2003 to December 2005. However, the PERS Board should credit him only with the salary he would have earned during that period at the EDA, taking into consideration normal merit pay increases, and also consider a refund for contributions based on increased "compensation" disallowed. See N.J.A.C. 17:2-4.1(c), (g)(3).
Accordingly, we reverse the denial of service credits for the period May 2003 to December 2005, but remand to determine the appropriate "compensation" credits for that period.
Affirmed in part; reversed in part; and remanded.
NOTES
[1] PERS initially denied the service credits which gave rise to the contested case.
[2] The Attorney General, on behalf of PERS, "intimat[ed]" that the mobility assignment "was a contrivance to avoid a penalty for retiring before age fifty-five, and then to boost his final salary when he did retire."
[3] A different definition of "compensation" applies to a person, unlike the petitioner here, who becomes a member of PERS on or after July 1, 2007. N.J.S.A. 43:15A-6(r)(2).
[4] The record reflects that the Port Authority's pension system affiliation has not changed and suggests that, due to his age, petitioner would have been better off remaining in the PERS until age fifty-five, rather than having joined the Port Authority pension in 2003.
[5] This statement was dicta because it made no difference to the resolution of Rokos whether the petitioner was an employee of the municipality or the State, as long as it was determined that he was not an independent contractor. If an employee, he would be a PERS member in either event. See id. at 181-82, 564 A.2d 1217.
[6] We do not address whether there could be a direct action against an agency based on its promises or assurances.