**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0784-20

ENID GOLDEN,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
TEACHERS' PENSION AND
ANNUITY FUND,

     Respondent-Respondent.

_____

Argued May 12, 2022 – Decided July 26, 2022

Before Judges Haas and Alvarez.

On appeal from the Board of Trustees of the Teachers' Pension and Annuity Fund, Department of the Treasury.

Kathleen Naprstek Cerisano argued the cause for appellant (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, PC, attorneys; Kathleen Naprstek Cerisano, of counsel and on the briefs).

Jeffrey D. Padgett, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Acting Attorney General, attorney; Melissa H. Raksa,

Assistant Attorney General, of counsel; Jeffrey D. Padgett, on the brief).

PER CURIAM

Enid Golden appeals an October 6, 2020 final agency decision of the New Jersey Department of the Treasury, Division of Pensions and Benefits (Division), Board of Trustees (Board) of the Teacher's Pension and Annuity Fund (TPAF), requiring her to remit $121,437.21—the amount she earned during a twelve-month period while employed by the Matawan Aberdeen Regional Board of Education (MARBOE) after retirement in addition to receiving her pension benefits. In light of the Administrative Law Judge's (ALJ) findings of fact adopted in the agency decision, we determine that Golden should reimburse the Board only the amount she earned from the commencement of her employment on August 25, 2014, until October 22, 2014, when MARBOE notified the Division of her employment, and therefore reverse.[1]

It is undisputed that Golden requested a retirement date of July 1, 2014. Accordingly, on February 25, 2014, the Division issued a Quotation of Retirement Benefits confirming the effective retirement date of July 1, 2014,

---

[1] The record does not contain sufficient information for us to calculate this figure.

and monthly benefit amount.  On March 6, 2014, the Division sent Golden a Notice of Retirement Approval, which included the following:

> Congratulations on your retirement. The Board of Trustees, at their regular meeting on March 6, 2014, approved your application for Service Retirement effective July 1, 2014 . . . .
>
> In accordance with law, you have until thirty days after (A) the effective date of your retirement, or (B) the date your retirement was approved by the Board of Trustees, whichever is the later date, to make any changes to your retirement. **Also, your first check cannot be mailed until after this thirty[-]day period.** However, the benefit will be retroactive to the original effective date of your retirement. Please allow an additional period for the disbursement and delivery of the check by the federal postal authorities.
>
> If you return to public employment following your retirement, you must notify our Office of Client Services immediately at (609) 292-7524.
>
> [(emphasis added).]

On June 9, 2014, Golden amended her retirement application to select the maximum benefit level, eliminating her husband's survivor benefit.   The Division's response stated:  "Once processing is completed, your retirement must be approved by the retirement system's board of trustees.   Your retirement benefit becomes due and payable [thirty] days after Board approval or [thirty] days after your effective retirement date, whichever is later."  Golden, whom the

ALJ found to be a credible witness, testified that she never received this communication.

That same month, MARBOE reached out to Golden to offer her the position of school superintendent. Believing her effective retirement date was July 1, 2014, Golden advised the MARBOE attorney that she could not communicate with a prospective public employer until August 1, 2014, a month after her retirement date. When the attorney replied that the position would be filled by then, Golden said: "so then it will."

Golden retired June 30, 2014. On July 22, 2014, the Division notified her that the monthly pension payment would be increased because of the deletion of survivor benefits. The letter also stated: "This change will be effective with your first allowance check dated August 1, 2014." On July 29, 2014, a week later, the Division sent Golden a second confirmation of the new benefit level.

That second written confirmation specifically indicated that Golden's effective retirement date was July 1, 2014. On August 1, 2014, TPAF issued Golden's first pension check for July, in the amended amount.

The MARBOE attorney contacted Golden again on August 1, 2014, and informed her that the position was still available. She sat for an August 7, 2014

4

interview, and was contracted to work for MARBOE from August 25, 2014, to June 30, 2015, at a per diem rate, without vacation or sick leave.

At its regular meeting, coincidentally also on August 7, 2014, the Board approved the change to Golden's benefit level and sent her written notification. Golden testified that when she received the letter, she assumed it was in error because she had already received her maximum check on August 1, 2014. Attributing the apparent mistake to "[p]robably one department . . . not speaking to the other in the bureaucracy of the Pension Board" and "some backed up stuff or something," Golden "just laughed and just threw [the letter] in the pile" of her retirement documents.

On October 22, 2014, MARBOE notified the Division of Employment After Retirement that it had hired Golden. Despite the October 22, 2014 mailing date, the Board asserts the notification was not received until November 25, 2014, over a month later.

On March 2016, some sixteen months after that, the Division wrote to MARBOE requesting documents concerning Golden's employment. Despite MARBOE's October 2014 notification, the matter was not assigned for further review until March 2016, approximately one and one-half years later, and almost a year after Golden's employment with MARBOE ended. The TPAF Supervisor

5

of the External Audit Unit testified at the administrative law hearing that the lengthy delay in reviewing the case was likely attributable to insufficient staffing.

The Division followed up with MARBOE three times in 2016 because it needed additional documents, or the documents provided were "unacceptable." The Division did not inform Golden that her retirement was being "audited." Ultimately, the Division determined that Golden's retirement was not bona fide because she returned to work within thirty days of August 7, 2014, the date the Board approved her change to the maximum option.

The TPAF Supervisor further testified that Golden's July 1, 2014 retirement "was non bona fide because she returned to employment prior to her retirement being due and payable." TPAF does not consider a recipient retired until retirement benefits become "due and payable and after the employer employee relationship is severed." There must be a break in service of at least thirty days following the retirement, or thirty days after the approval by the Board, whichever is later.

Because the Board took the position that Golden returned to employment too close to the retirement date—August 7—she had to return the gross salary she earned with MARBOE, or $121,437.21. Although the TPAF Supervisor

6

acknowledged that Golden's first monthly retirement payment was issued before her "due and payable" date as determined by the Division, she considered the payment an error made by the Retirement Bureau, and did not factor it into whether Golden's retirement was bona fide.

The TPAF Supervisor confirmed that the July 18, 2017 letter was the first notification Golden would have received that there was a problem with her retirement benefits and post-retirement employment. She had submitted a memo to the Board in which she stated that the Division received the return to employment form on November 25, 2014, about five months after Golden's July 1, 2014 retirement date. Golden's benefits in those five months amounted to $53,429.90, and she had suggested that the Board consider having Golden return this amount.

In its July 18, 2017 letter to Golden, the Division stated:

> A bona fide retirement must also be due and payable, and your retirement does not become due and payable until there has been a cessation of employment of at least 30 days following your retirement date, or 30 days following approval by the TPAF Board of Trustees, whichever is later. If you return to employment on either a paid or voluntary basis - before the 30 days have elapsed you should expect to continue enrollment in the TPAF. Your retirement will be considered invalid. And you will

A-0784-20

> remain an active employee under your
> original TPAF account.[]

[(emphasis in original).]

The letter demanded that Golden remit $394,469.59, which represented the sum of total benefits paid to her as of August 1, 2017, plus additional TPAF contributions from her post-retirement position. After correspondence with Golden's attorney, the Board reduced the demand amount to $121,437.21. Golden then requested a hearing in the Office of Administrative Law as a contested case. N.J.S.A. 52:14B-1 to -15.

After the hearing closed, the ALJ found that the sum Golden earned from MARBOE came to $121,437.21 in total. However, the ALJ held that the Board was only entitled to $53,429.90, the amount she believed Golden earned before the Board received MARBOE's notification.[2] The Board rejected this decision and concluded that Golden owed the entire $121,437.21. Accordingly, commencing April 2018, the Board began deducting $2,000 monthly from Golden's benefits.

---

[2] The figure may be an error, as the TPAF Supervisor's memo indicates that $53,429.90 was the amount of benefits Golden received from the beginning of her retirement until the Board received MARBOE's notification—a figure unrelated to her earnings with MARBOE.

Golden denied receiving the Board's July 10, 2014 communication that her "due and payable date" would be thirty days after its approval of the option change. Understandably, she stated she "went into shock" when she received the Audit Unit's letter because she thought she had "dotted [her] Is, crossed [her] Ts." Golden could not remember if she personally notified the Board of her return to employment.

The ALJ also found that under the relevant regulations, Golden was not separated from employment until August 7, 2014. However, she pointed out that Golden's confusion about her retirement date stemmed from the Board's own inconsistent actions, including the issuance of her first retirement check on August 1, 2014. The check, in the amended amount, led her to believe that the effective date of her retirement was July 1, 2014.

The ALJ observed that Golden's decision to ignore the August 7 letter was "careless . . . but not unreasonable. The August approval action by the Board could have been construed as a nunc pro tunc action" since the July 1 check reflected the higher benefit level. "An individual not steeped in the regulations and procedures of the Board," she stated, "could have assumed that the August Board action was a formality."

A-0784-20

The ALJ further found that equitable considerations affected the Board's right to reimbursement. The Board was dilatory in responding to the notice from MARBOE and mistakenly issued a check dated August 1, 2014, in the increased amount. Furthermore, Golden credibly testified that she simply would not have accepted employment had she known it would jeopardize her pension. Thus, the ALJ found the Board was only entitled to recover Golden's earnings from August 25, 2014, until November 25, 2014, the date the Board acknowledged receiving MARBOE's notification.

Although the Board's October 6, 2020 decision adopted the ALJ's findings of fact and conclusions of law, it rejected the ALJ's determination that Golden was careless but not unreasonable. The Board considered her "inaction [to be] unreasonable" because she did not contact the Board to clarify her status. Furthermore, Golden had previously applied for retirement and was informed of the consequences of noncompliance. Her assumed familiarity with the retirement process meant a reimbursement of at least $121,437.21 was warranted. She was required to remit all of her MARBOE earnings.

On appeal, Golden raises the following issues for our consideration:

POINT I

THE TPAF BOARD'S DETERMINATION THAT APPELLANT'S RETIREMENT WAS NOT BONA

10

FIDE AND THAT SHE MUST GIVE TPAF ALL OF HER POST-RETIREMENT EARNINGS IS NOT SUPPORTED BY THE FACTS AND APPLICABLE LAW AND MUST BE REVERSED.

A.  STANDARD OF REVIEW

B.  APPELLANT'S POST-RETIREMENT EMPLOYMENT AS INTERIM SUPERINTENDENT WAS AUTHORIZED BY N.J.S.A. 18[A]:66-53.2b AND NOT THE RE-ENROLLMENT PROVISIONS OF N.J.S.A. 18A:66-53.2a.

C.  APPELLANT HAD A REASONABLE BELIEF THAT HER JULY 1, 2014 RETIREMENT WAS "DUE AND PAYABLE" AND THUS EFFECTIVE WHEN SHE RECEIVED HER FIRST PENSION CHECK ON AUGUST 1, 2014, AND THIS REQUIRES AN EQUITABLE REMEDY.

D.  THE DIVISION OF PENSIONS AND BENEFITS RECEIVED A NOTIFICATION OF EMPLOYMENT AFTER RETIREMENT FORM INFORMING IT OF APPELLANT'S POST-RETIREMENT EMPLOYMENT IN NOVEMBER 2014 AND ITS FAILURE TO INFORM APPELLANT OF ANY ALLEGED VIOLATION UNTIL JULY 2017 REQUIRES AN EQUITABLE REMEDY.

E.  THE TPAF BOARD'S REFUSAL TO CONSIDER AND APPLY THE ALJ'S FACTUAL FINDINGS AND CREDIBILITY DETERMINATIONS AND REACH AN EQUITABLE AND APPROPRIATE REMEDY

11

IS ARBITRARY, CAPRICIOUS, AND UNREASONABLE.

I.

Judicial review of an agency's final decision is limited. Hayes v. Bd. of Trustees of Police & Firemen's Ret. Sys., 421 N.J. Super. 43, 51 (App. Div. 2011).

Our "function is to determine whether the administrative action was arbitrary, capricious or unreasonable." Burris v. Police Dep't W. Orange, 338 N.J. Super. 493, 496 (App. Div. 2001) (citing Henry v. Rahway State Prison, 81 N.J. 571, 580 (1980)); see also Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs, 186 N.J. 5, 16 (2006). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443–44, 897 (App. Div. 2006) (citing McGowan v. New Jersey State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002); Barone v. Dep't of Human Servs., 210 N.J. Super. 276, 285 (App. Div. 1986)).

We are not bound by an agency's decision on a question of law. Thurber v. City of Burlington, 191 N.J. 487, 502 (2007). According substantial deference to an agency's interpretation of the relevant statutes does not mean deference is owed where the interpretation is "plainly unreasonable." Stevens

v. Bd. of Trs., 294 N.J. Super. 643, 652 (App. Div. 1996); Haley v. Bd. of Review, Dep't of Labor, 245 N.J. 511, 519 (2021).

The Board interprets N.J.A.C. 17:3-6.2 and N.J.A.C. 17:3-6.3 to mean the "due and payable" date was Golden's date of retirement. Those provisions state:

> 17:2–6.2 Effective date
> A member's retirement allowance shall not become due and payable until 30 days after the date the Board approved the application for retirement or 30 days after the date of the retirement, whichever is later.
>
> 17:2–6.3 Effective dates; change
> (b) If a member requests a change of retirement date or option selection before the member's retirement allowance becomes due and payable, said change will require approval of the Board and the revised retirement allowance shall not become due and payable until 30 days have elapsed following the effective date or the date the Board met and approved the change in the member's retirement application, whichever is later.

Those regulations appear, however, to determine when retirees should be paid—not when they effectively retire. N.J.A.C. 17:3-6.2 distinguishes between the "date of retirement," "the date the Board approved the application," and the "due and payable date," stating that the last date is thirty days after either of the first two, whichever is later.

Similarly, N.J.A.C. 17:2-6.3 distinguishes between the retirement approval date, the effective date, and the due and payable date. Thus, it is not

A-0784-20

clear that the Board has a mandate to make the due and payable date the date of retirement. Golden began to receive benefits in the increased amount within thirty days of her job termination. This was consequential, and certainly would have led her to believe her retirement date was July 1, 2014. Adding to the confusion is N.J.A.C. 17:3-6.1(a), which states: "[a] member's retirement application becomes effective on the first of the month following receipt of the application unless a future date is requested."

II.

Equitable principles control the decision here, specifically, the doctrines of "turn square corners" and equitable estoppel. Golden argues equitable considerations in general apply, anchoring her argument on Vliet v. Board of Trustees of Public Employees' Retirement System, 156 N.J. Super. 83 (App. Div. 1978) and two unpublished cases: Chiappini v. Board of Trustees, No. A-3983-09 (App. Div. July 29, 2011), and Knox v. Board of Trustees, No. A-1444-10 (App. Div. Feb. 23, 2012).

In Vliet, a retiree worked for a township for several years in what he believed to be a "temporary" position. 156 N.J. Super. at 85–86. Prior to accepting the position, the retiree asked the Public Employee Retirement System (PERS) whether his allowance would be reduced if the "temporary" position

provided wages in excess of $500. Id. at 85. PERS answered that it would not. Ibid. His employer, the township, asked PERS if his pension would be jeopardized if he was given "part-time" work. Ibid. PERS responded that he could accept temporary employment, but "if he accepts employment which will require him to re-enroll in (PERS), his retirement allowance would be reduced while he was reemployed." Ibid. PERS eventually decided that the retiree's position was not temporary and demanded that he return all benefits received. Id. at 87-88.

Although we agreed with PERS that the position was not temporary, we decided that the appropriate remedy had to be fashioned taking into account equitable considerations. The equities were "not all on his side" because "[h]ad he advised the Division of Pensions of his exact employment status he could have received more specific advice." Id. at 89. However, his employment paid significantly less than his retirement benefits, and he would never have decided to continue working if he had known it would jeopardize his pension. Ibid. Considering these facts, we ordered him to pay PERS the money he earned instead of all of his pension benefits. Ibid. In this case, it would be inequitable to impose no obligation on Golden. We do not address the unpublished cases upon which she relies, as they have no precedential value. R. 1:36-3.

A-0784-20

In this case, like in <u>Vliet</u>, the equities are not all on Golden's side because she ignored the Board's August 7, 2014 notice. Nonetheless, the present matter falls within the ambit of the "turn square corners" and equitable estoppel doctrines. The "turn square corners" doctrine holds that the government may not "conduct itself so as to achieve or preserve any kind of bargaining or litigational advantage." <u>New Concepts For Living, Inc. v. City of Hackensack</u>, 376 N.J. Super. 394, 401 (App. Div. 2005). Rather, "its primary obligation is to comport itself with compunction and integrity, and in doing so government may have to forego the freedom of action that private citizens may employ in dealing with one another." <u>Ibid.</u> To invoke the "turn square corners" doctrine, citizens need not prove that they were blameless, or that the government acted in bad faith. <u>CBS Outdoor, Inc. v. Borough of Lebanon Planning Bd./Bd. of Adjustment</u>, 414 N.J. Super. 563, 586–87 (App. Div. 2010); <u>see</u> <u>New Concepts</u>, 376 N.J. at 402-403.

For instance, in <u>New Concepts</u>, a non-profit moved to a new location without informing the city tax assessor. 376 N.J. at 396. It retained its old location for leasing to other non-profits. <u>Ibid</u>. At some point after the move, the tax assessor sent the non-profit some paperwork to complete along with an "initial statement" to be filled out to continue its tax-exempt status. <u>Ibid.</u> These

16

materials were sent to the old location but were returned by the post office, marked "forwarding expired." Ibid. The tax assessor then noticed the non-profit's sign at the new location and sent the paperwork to the new location. Id. at 397. However, he forgot to include the "initial statement" with the paperwork. Ibid.

Thereafter, the tax assessor placed the old location back on the tax rolls and mailed the tax assessments to the old location. Ibid. The non-profit never received those assessments. Ibid. As a result, they went unpaid, and the old location was scheduled for a municipal tax sale. Ibid.

When the non-profit received the municipal tax sale notice, which was communicated both by mail and by phone, it promptly reached out to the city. Ibid. Initially, the city agreed to reassess the situation if the non-profit would send documents verifying that it was tax-exempt. Id. at 398. However, after the non-profit sent the documents, the city reversed course and asserted that the non-profit was liable for at least some of the tax assessments because the deadline for appeal had passed. Ibid.

We found that the non-profit "probably had an obligation to notify the assessor that it had relocated its operations." Id. at 402. However, we also found the city failed to notify the non-profit of its tax delinquency, and the non-profit

contacted the city in a timely manner. Id. at 403. Thereafter, the city, "having lulled plaintiff into a false sense of security, reversed its position despite having led plaintiff to believe that it was willing to work with plaintiff in a fair, informal and reasonable manner to fashion a remedy to plaintiff's problem." Ibid. Because the city did not turn square corners, the non-profit was permitted to pursue its tax appeal. Ibid.

The "turn square corners" doctrine has been invoked even when the agency involved was not responsible for any miscommunication. In Francois v. Board of Trustees, 415 N.J. Super. 335 (App. Div. 2010), an employee of the New Jersey Economic Development Authority (EDA) accepted a "mobility assignment" that required him to work for the Port Authority of New York and New Jersey (Port Authority). Id. at 338. Both agencies assured the employee that he would receive pension credit for time spent with the Port Authority. Id. at 340. However, these assurances were not given at PERS's behest, and PERS eventually refused to grant the credit for the duration of the assignment. Id. at 344-45. On appeal, we overturned PERS's decision, citing the "turn square corners" doctrine. Id. at 353.

It appears to us that the Board did not turn square corners in this case, albeit for innocent reasons. All the delays occasioned by the Audit Unit

A-0784-20

effectively increased the amount that Golden owed when demand for reimbursement was finally made.

Previously, on July 10, 2014, the Board informed Golden's husband that he would not receive a survivor's portion, and a second July 22, 2014 letter advised Golden that her allowance would be increased because of the elimination of the survivor benefit. That was confirmed again on July 29, 2014. And finally, of course, on August 1, 2014, the Board deposited Golden's check reflecting the new benefit amount.

In light of these actions, Golden reasonably believed that her retirement effective date was July 1, 2014. It is no surprise that she believed the letter of August 7, 2014, issued in error.

And a citizen need not be entirely blameless—although in this case, it was Golden's failure to contact the Board to confirm the effective date of her retirement that the Board relies on to establish her culpability. But that error, compared to that of the petitioner in New Concepts, is minor. The Board's conduct, although free of any malice, fell short of its primary obligation to make the terms and conditions consistent and crystal clear.

The Board argues that because everyone is presumed to know the law, Golden should be presumed to know that under N.J.A.C. 17:2-6.3(b), a change

19

in benefit level does not become due and payable until thirty days after the Board approves the change.  Even if Golden had known this, she was entitled to rely on the four Division communications that her modification request was approved.  Indeed, the Division informed her in its March 6, 2014 letter that the check could only be mailed thirty days after approval.  Thus, the Board arguably assured Golden many times that her due and payable date was August 1, 2014.  Her reliance on these communications was reasonable, and the Board must turn square corners in its interactions with a retiree.

Equitable estoppel "is an equitable doctrine, founded in the fundamental duty of fair dealing imposed by law."  Knorr v. Smeal, 178 N.J. 169, 178 (2003).  The doctrine is rarely applied against a government entity and may only be invoked for that purpose to prevent manifest injustice.  Bridgewater-Raritan Educ. Ass'n v. Bd. of Educ. of Bridgewater-Raritan Sch. Dist., Somerset Cty., 221 N.J. 349, 364 (2015).  In some formulations, the doctrine requires a showing that the "defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment."  Ibid.  In other formulations, "[t]he essential elements of equitable estoppel are a knowing and intentional misrepresentation by the party sought to be estopped under circumstances in which the

misrepresentation would probably induce reliance, and reliance by the party seeking estoppel to his or her detriment." In re Johnson, 215 N.J. 366, 379 (2013) (emphasis added).

Some courts have held that "[t]here need not be evidence of fraudulent intent for equitable estoppel to apply." Tasca v. Bd. of Trs., Police & Firemen's Ret. Sys., 458 N.J. Super. 47, 60 (App. Div. 2019). For instance, in In re Johnson, the Supreme Court applied equitable estoppel where the Department of Personnel (DOP) reneged on its assurances to the Cape May County prosecutor that he was entitled to an unclassified agent, that the requirement for classification would not apply to agents already hired, and that an audit, which was to be conducted, would not affect those hired before a certain date. 215 N.J. at 372, 384-85. After making these promises, the DOP sought to move the prosecutor's long-term agent to a classified position. Id. at 385-86. There is no indication that the DOP intended to deceive when it made the promises. Nevertheless, the Supreme Court held that equitable estoppel applied. Id. at 386-87.

Also noteworthy is Hemsey v. Board of Trustees, Police & Firemen's Retirement System, 393 N.J. Super. 524, 531–36 (App. Div. 2007), rev'd on other grounds, 198 N.J. 215 (2009), where representatives of the PFRS Board

assured a member that his post-retirement employment would not affect his benefits, but the Board later sought to recover about $450,000 for benefits he had received. Under these facts, we found that equitable estoppel barred PFRS from recovery. Ibid.

Even if we presume that Golden knew the law, we cannot presume that she knew the date of approval was other than July 1, 2014, given the payment of her first retirement check in the increased amount. The payment preceded formal approval. Furthermore, the Board did not reach out to Golden until over three years after her receipt of the first retirement check. Obviously, if the Board had contacted Golden about the situation promptly after notification from MARBOE, this dispute and the long-running litigation would not have occurred. The Board has no explanation for the delay between MARBOE's undisputed notification and the receipt, which lasted over a month. In consideration of these facts, the Board is equitably estopped from claiming more than Golden's earnings from August 25, 2014, to October 22, 2014, when MARBOE sent its notification.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0784-20